**In the Matter of VITREOUS STEEL PRODUCTS COMPANY, Debtor.**

**Appeal of Lynn M. MILLER, Trustee and Northern Indiana Public Service Company.**

**No. 89–1047.**

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1989.

Decided Aug. 7, 1990.

Rehearing and Rehearing In Banc Denied Oct. 5, 1990.

---

Lynn M. Miller, Trustee Miller & Miller, Elkhart, Ind., pro se.

Joel R. Page, Jr., Paul A. Rake, Eichhorn, Eichhorn & Link, Hammond, Ind., for appellant Northern Indiana Public Service Co.

Gary D. Boyn, Elkhart, Ind., for appellee Midwest Commerce Banking Co.

William I. Kohn, Lynn C. Tyler, Seth D. Linfield, Barnes & Thornburg, South Bend, Ind., for appellees VITCO, Inc. and Richard Champlin.

Paul A. Rake, Eichhorn, Eichhorn & Link, Hammond, Ind., for debtor.

Before WOOD, Jr., COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

Vitreous Steel Products ("Vitreous") is a manufacturer of enamelled steel goods with a manufacturing facility in Nappanee, Indiana and executive offices in Cleveland, Ohio. Thomas Weil was President, and all of the company's stock was owned by the Weil family until 1986. In 1981, the company borrowed money from the Saint Joseph Valley Bank (now known as Midwest Commerce Banking Company, hereinafter "the Bank"), and gave a mortgage on the plant's realty and fixtures and a security interest in all the company's personal property. The security agreement covered all presently owned and after acquired personal property; however, the financing statement listed "All Inventory; Accounts Receivable; General Intangibles; and Equipment described in Exhibit A attached hereto and incorporated herein." Exhibit A listed the property owned by the corporation, piece by piece. The financing statement fails to reflect any reference to property acquired subsequent to the date of the loans. Thus the Bank's security interest in after-acquired property was unperfected.

Not long after taking the loan from the Bank, Vitreous borrowed additional money from the Florence M. Weil Trust, and gave a second mortgage and a junior security interest on the same goods. The security agreement and the financing statement both contained a reference to after acquired personal property. The note provides that payment cannot be made if the payment would cause Vitreous to be in violation of its loan agreement with the Bank. The Bank's agreement provides that Vitreous may make payments on the

Trust note only from profits from the preceding quarter, and only when the loan from the Bank is not in default.

Through the 1980s the business was in financial difficulty, principally because of lack of executive leadership. In 1985, the business lost $1,000,000, and its net worth dropped below zero, thus technically putting it in default to the Bank. The Bank announced that it deemed itself insecure, but did not declare a default at that time. Rather, it commenced discussions with Thomas Weil about letting someone else run the company. Weil looked for a buyer for his stock without success. In April, 1986, the Bank called a Richard Champlin, and asked him to look at Vitreous' operations. Champlin was a private investor who had a reputation of purchasing failing companies, making them financially sound, and selling them. The Bank, trusting Champlin's business ability, had asked him to step in on other occasions where outstanding loans were in jeopardy. Champlin, a resident of Northern Indiana, determined that it was financially feasible to move the executive offices from Cleveland to the manufacturing plant in Nappanee; thus the closing of the Cleveland office realized a savings to the company. In his role as potential investor, Champlin worked with Vitreous' creditors beginning in June, 1986 in an attempt to work out a composition agreement. These efforts were unsuccessful. Finally, on July 10, Champlin bought 64% of the stock of Vitreous from the Weils at a cost of $240. At the same time, he purchased the Florence M. Weil Trust's secured note (principal amount $180,000) for $100. Champlin named himself President and sole Director of Vitreous the same day. From that time, Champlin caused Vitreous to pay for all new purchases in cash. All current bills were paid immediately, but no payments were made on debts incurred before July 10.

Champlin continued his efforts to reach a composition of creditors, but was unable to reach an agreement on acceptable terms. Toward the end of August 1986, the Bank informed Champlin that it intended to repossess. Champlin asked them to give him a short time to get operations ready for the foreclosure, so as to maximize the accounts receivable. The idea was to have as much enamelling work as possible ready to deliver, and as little as possible in process.

On August 26, 1986, Champlin formed a new corporation, VITCO, supplying the statutory minimum capitalization of $1000. On August 28, Champlin, as Vitreous' president, caused Vitreous to pay him (Champlin) $13,860 as reimbursement for travel expenses which were incurred "back quite a ways." On August 29, 1986, Champlin caused Vitreous to voluntarily surrender possession of all of Vitreous' assets to the Bank. At that time, Vitreous owed the Bank $848,342.78, with interest at one point over the prime rate accruing at a rate of $215.53 per day. Vitreous owed Champlin $180,000 on the Trust loan. It owed its largest unsecured creditor, Northern Indiana Public Service Company ("NIPSCO"), about $500,000.

On August 29, the same day as the surrender of the assets, the Bank entered into a short term lease agreement with the newly-formed VITCO. VITCO was to operate Vitreous' assets on behalf of the Bank while the Bank looked for a buyer for the going concern. Meanwhile, VITCO was to receive a management fee of $2500 per week (from which Champlin took a salary equivalent to $100,000 per year). VITCO worked on the Bank's behalf until November 1, 1986. All the witnesses agree that the company turned a small profit during September and incurred a loss during October. The Bank and Champlin say that the overall loss was something like $140,000, while the Trustee and NIPSCO say it was about $6,000. In any case, the Bank claimed that, as of November 1, the total amount due had increased to $1,027,781.85, with the increase over the amount owed on August 29 due primarily to business losses.

While VITCO ran the operation, the Bank commenced its search for a buyer and ran an advertisement in the Wall Street Journal, East and Midwest editions, on September 10 and 11. The advertisement said that bids were to be made on the whole business before September 30, and the minimum bid acceptable had to be at

least $900,000. To the surprise of Champlin and the Bank, considerable interest was expressed. The Bank took several calls from interested parties, and some of them toured the facility. In the end, three formal offers were received. One, from Paul Ehrlich of FAMCO, offered $1,200,000, of which $900,000 was to be in cash. The Bank was to guarantee that a certain (rather high) amount of the accounts receivable would actually be collectible, and to hold FAMCO harmless from any liability arising from toxic wastes possibly on the property. The risk of a toxic waste problem was quite real, and the Bank did not agree to accept that possible liability. After subtracting for that contingent liability, and for the likelihood of having to pay off on some of the receivables, the Bank found the offer inadequate. A second offer was received from Edgar Gray, a former employee of Vitreous. He offered $900,000 plus 80% of the book value of accounts receivable plus 60% of the book value of the inventory, for a total of about $1,500,000. Gray actually had only $150,000 in hand at the time the offer was made. He required another thirty days to arrange financing (to allow lenders to do their due diligence investigations). The Bank did not believe that Gray would be able to arrange financing, and did not have any confidence in Gray's ability to run the business. Viewing the offer as pie-in-the-sky, the Bank rejected it. Gray's alternate proposal, received in mid-October, of $550,000 for all assets except the accounts receivable, was rejected as untimely.

The third offer was from VITCO. Originally, VITCO offered $900,000, but by the time the sale was closed on November 1, the price was raised to $1,027,781.85—exactly the same as the amount of the debt owed the Bank. VITCO was unwilling to make the deal before soil tests were completed which would show the absence of toxic waste on the site, but VITCO did not demand a hold-harmless agreement. The deal also required 100% financing by the

Bank, plus a $300,000 line of credit for working capital, secured by all the assets of VITCO, real and personal, plus a personal guarantee by Champlin of amounts drawn on the line of credit.

While VITCO and the Bank waited on soil sample results, Vitreous became the subject of an involuntary Chapter 7 petition, filed by three small creditors on October 14, 1986. The Bank and VITCO signed the deal described above on November 1, before the bankruptcy court's order for relief was entered, transferring all the personalty of Vitreous to VITCO. The real estate was to be transferred as soon as foreclosure proceedings in the state court would allow. The parties agreed that the real estate had a value of $350,000. Therefore they prepared a bill of sale for the personalty at a price of $677,781.85 (the total price of $1,027,781.85 minus $350,000 for the realty), which was paid by VITCO's secured note in that amount. The mortgage securing the note stated that the Bank's lien was the first lien on the property, junior only to taxes and special assessments. It appears that Champlin released the mortgage he obtained from the Weil Trust.

The bankruptcy court entered its order for relief on November 14, 1986, 77 days after the August 1 voluntary surrender of the assets to the Bank. Thus at the time the order for relief was entered, the only asset owned by Vitreous was the real property. Although the voluntary surrender fell within the preference period of 11 U.S.C. § 547, the transfer as a whole has not been challenged on those grounds. Only that portion of the transfer which gave the Bank possession of equipment not covered by the Bank's financing statement was challenged on those grounds.[1] The Bank was owed $1,027,000 but had possession of the personalty. After the sale of the personal property to VITCO, the Bank

---

**1.** The record fails to disclose what equipment, if any, was acquired by Vitreous after the Bank took its security interest. Although the record contains a list of property owned by Vitreous at the time of the Bank's loan, there is no listing of the property in their possession as of the time of

the sale to VITCO. In light of our conclusion that the Bank's security interest in after acquired property was perfected by possession before the sale to VITCO, *infra* at 1233–1234, we need not consider what was covered by the financing statement.

claimed a debt of $350,000, secured by a mortgage.

## PROCEEDINGS BELOW

Just four days after entry of the order for relief, on November 18, 1986, the Bank filed a motion to lift the automatic stay under § 362,[2] and to abandon the real estate under § 554. This motion was vigorously contested by the Trustee and by NIPSCO. A flurry of motions and discovery culminated in a three-day hearing on June 2, 10 and 11, 1987. At the outset of the hearing, Bankruptcy Judge Dees said:

> First of all, the Court can only rule on what's before it, obviously, and that is a motion for relief from stay in this matter filed by the bank in accordance with 11 USC 362.
>
> Now, 362 has certain elements as I am sure all the lawyers in here know. Does the Debtor in this case, which is Vitreous, have equity in the property? I think that's obviously got to be one of the matters; and is the property necessary to an effective reorganization? ...
>
> Now, according to Bankruptcy Rule 7001, this particular proceeding that we have got in front of us this morning is not the place to challenge the validity or the priority or the extent of the bank's liens once the bank establishes that it has them....
>
> We are here on a motion to lift stay, and if your contentions or arguments don't relate to 362 then in my judgment they are not relevant and I will have to rule accordingly based upon proper objections....

MR. RAKE (attorney for NIPSCO): On the 362 elements, the bank does still have to prove that it has the liens and that the liens' values are greater than the value of the property?

THE COURT: I think that's true, yes.

In the course of the hearing, no proffered evidence was rejected as being outside the scope of the § 362 inquiry. The Trustee and NIPSCO tried to establish that the sale of the assets to Champlin was not a legitimate sale in that it was merely a collusive effort to sell the business to Champlin shorn of the obligations to the general creditors. They tried to demonstrate that Champlin and the Bank paid no attention to the actual value of the assets in setting the price, but were only concerned with the amount Vitreous owed the Bank. They argued that a twenty-day exposure to the market was too short to allow a real offer which assuredly would have produced plenty of equity in the property to pay off general creditors' claims. They argued that liquidation value was inappropriate as a measure of the value of the property, because there was no urgency to sell.

Judge Dees ruled in favor of the Bank on July 31, 1987. He found that liquidation value was the appropriate measure of value in this case, and that the property was worth $350,000. Because the bank was found to have a claim of exactly that amount, there was no equity in the property. Judge Dees also specifically found that the Bank and Champlin had not acted collusively, and that the sale was commercially reasonable. He found that the evidence was undisputed that the Bank held a lien on all the realty and personalty. He did not make a finding on the dollar value of the personalty, but implicit in his finding that the value assigned to the debt to the Bank stood at $350,000 is a finding that the personalty was sold at a commercially reasonable price.

One week after the stay was lifted, the Bank completed its pending foreclosure action against Vitreous in the state courts.

The Trustee and NIPSCO did not give up. They appealed the § 362 decision to the district court, and also filed a new adversary complaint in the bankruptcy court against the Bank and against Champlin personally. Count I charged that the surrender to the Bank of the equipment acquired after 1981 (and therefore not covered by the financing statement) constituted a preferential transfer under § 547. Count II charged that the sale on November 1 of the personal property to VITCO failed to produce a value reasonably equiv-

---

**2.** Unless otherwise noted, all citations of statutory sections are to Title 11 of the United States Code, the Bankruptcy Reform Act of 1978, as amended.

alent to the value of the property, and therefore was a fraudulent conveyance under § 548(a)(2). Count III alleged that the sale was to delay or defraud creditors, and was a fraudulent conveyance under § 548(a)(1). Count IV charged that the sale was commercially unreasonable. Count V alleged that the Bank's retention of the equipment not covered by its financing statement was a conversion under Indiana law. Count VI charged the Bank with fraud, and asked that its debt be equitably subordinated. Count VII concerned Champlin's purchase of the Weil Trust note, and asked that it be declared void. The last count, Count VIII, charged that the payment of $13,800 to Champlin for travel expenses was a fraudulent conveyance.

■■■ Judge Dees ruled on November 16, 1987 that Counts I through VI were barred, having been decided on the motion to lift the stay. Counts VII and VIII were held not to state claims against the Bank. Summary judgment was given in favor of Champlin on Count VIII. The bankruptcy court found that at the time of the $13,800 payment, "all creditors of Vitreous were paid," and thus the transfer was not a fraudulent transfer. This decision, like the decision on the motion to lift the automatic stay, was appealed to the district court.[3]

The district court consolidated the two appeals, and affirmed both decisions in ev-

ery respect. Chief Judge Sharp held that it was not clear error to find that Champlin and the Bank had not colluded, and that despite Judge Dees' limiting comments, the Trustee had had the opportunity to make a complete record at the § 362 hearing on all the issues involved in Counts I through VI of the later complaint. He did not directly address the judgments on Counts VII and VIII. Additionally, Judge Sharp agreed with the Bank's argument, raised for the first time in the district court, that NIPSCO, as an unsecured creditor, did not have standing to pursue claims on behalf of the estate. The Trustee and NIPSCO appeal to this court. We affirm in part and reverse in part.

## DISCUSSION

### I. NIPSCO'S STANDING

■■■ The decision of the district court dismissing NIPSCO from the case was proper except insofar as it prevented NIPSCO from pursuing the count of the adversary complaint requesting that the Bank's claim be equitably subordinated to those of the unsecured creditors. NIPSCO has no interest in this litigation except in its role as an unsecured creditor. The trustee in bankruptcy acts as representative of all the unsecured creditors. *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1342–43 (7th Cir.1987), *cert. denied* 485 U.S. 906, 108 S.Ct. 1077, 99

---

3. There was no discussion of Count VII in the bankruptcy court's written opinion granting Champlin's motion for summary judgment. The court's apparent lack of consideration of this count of the complaint might easily have destroyed the finality of the bankruptcy court's judgment, thereby destroying the appellate jurisdiction of the district court and this court. Absent special certification, a judgment is final only if it disposes of all of the claims of all of the parties. Fed.R.Civ.P. 54(b) states, in part, "In the absence of such [special certification], any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." In this particular case we hold that there was a final order.

It is the better practice for courts to explain their decisions with clarity on the issues decided. *See* Circuit Rule 50. Failure to adequately rule on a claim can deprive the court's order of finality. *See Yockey v. Horn,* 880 F.2d 945, 948 n. 4 (7th Cir.1989). In this case, the bankruptcy court's decision on the other counts insured that there would be no assets remaining in the estate for distribution, so the status of the Trust note was moot. Count VII was included among the counts dismissed in the Fed.R.Civ.P. 58 judgment, even though there was no explanation of why it was being dismissed. We hold that the bankruptcy court's order was final and appealable, because a decision on the merits was clearly made. The grant of summary judgment to the Bank and to Champlin on the adversary complaint was final and appealable to the district court, and this court has jurisdiction.

L.Ed.2d 237 (1988). NIPSCO does not argue that it should have standing because the Trustee is not adequately representing its interests—on the contrary, NIPSCO is only interested in assisting the Trustee in maintaining actions the Trustee has already commenced. An unsecured creditor has no standing without first obtaining special authorization from the court. *Matter of Perkins,* 902 F.2d 1254, 1257–58 (7th Cir.1990). Absent court permission, creditors are without authority to pursue a claim of fraudulent conveyance, *Matter of Xonics Photochemical, Inc.,* 841 F.2d 198, 202–03 (7th Cir.1988), to pursue a preference action, *Koch Refining v. Farmer Union Central Exchange, Inc.,* 831 F.2d 1339 (7th Cir.1987), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *Delgado Oil Co., Inc. v. Torres,* 785 F.2d 857, 860 (10th Cir.1985), or to enforce the Trustee's strongarm powers under § 544(a). *Moyer v. Dewey,* 103 U.S. 301, 26 L.Ed. 394 (1881); *Boyd v. Martin Exploration Co.,* 56 B.R. 776 (E.D.La.1986). The state law claim of conversion does not charge that the Bank took anything belonging to NIPSCO, or even anything in which NIPSCO had a security interest. It is our considered opinion that NIPSCO is without standing to press that claim. *Redman v. Gould,* 7 Blackf. 361, 362 (Ind.1845) (plaintiff must have a property right in the converted goods).

■■■ On the appeal from the decision lifting the automatic stay, our review of the district court's dismissal of NIPSCO is taken using an abuse of discretion standard. Because NIPSCO's interests are identical with those of the Trustee in this matter, and because the Trustee had appeared to oppose the Bank's motion, NIPSCO's involvement is in the nature of intervention under Fed.R.Civ.P. 24(b). Our review of a decision denying intervention under that Rule is for abuse of discretion. *United States v. 36.96 Acres of Land,* 754 F.2d 855, 860 (7th Cir.1985). NIPSCO and the Trustee argue that the dismissal was an abuse of discretion because without NIPSCO's help, the Trustee would be overpowered by Champlin's and the Bank's financial and legal resources, and would thus

be unable to get a meaningful hearing on the issues. This argument has no merit. NIPSCO is not prevented from volunteering its services to the Trustee. There is nothing to prevent the Trustee from accepting help from the creditors she represents. The Trustee is the proper party to press the estate's claims. If NIPSCO wishes to help the Trustee to do that, it may. But it is not a denial of due process to refuse to allow NIPSCO to sue in its own name to protect the interests of the estate.

However, NIPSCO does have standing to seek equitable subordination of the Bank's claim in bankruptcy under § 510(c). Equitable subordination is not a benefit to all unsecured creditors equally, at least where the creditor whose claim is objected to is at least partially unsecured; it is a detriment to the creditor whose debt is subordinated. Thus, when a party seeks equitable subordination, it is not acting in the interests of all the unsecured creditors. While the Trustee may find that it is in the best interests of the estate to seek equitable subordination, individual creditors have an interest in subordination separate and apart from the interests of the estate as a whole. The individual creditor should have an opportunity to pursue its separate interest. We reverse the dismissal of NIPSCO as plaintiff in its claim for subordination of the Bank's debt.

## II. LIFTING THE AUTOMATIC STAY

■■ As soon as a petition in bankruptcy is filed, the automatic stay provisions of 11 U.S.C. § 362 take effect. The automatic stay prevents all pre-petition creditors from taking any action to collect their debts. This is so even if the creditor has a mortgage or security interest in the property of the debtor, and even if the value of the collateral is less than the amount of the debt. In such a case, bankruptcy proceedings may only delay the inevitable result. There may be no reason to make the creditor wait until the final distribution of the estate to get what it bargained for, and indeed early release of the collateral may aid administration of the estate by allowing

a quicker determination of the amount of the undersecured creditor's unsecured claim. § 506(a). For this reason, Congress included a provision for relief from the automatic stay. § 362(d). Under certain circumstances the bankruptcy court may lift the stay under that section, either for cause, including lack of adequate protection of a creditor's interest, or, more important to this case, the stay may be lifted if the debtor has no equity in the collateral and the collateral is not necessary to an effective reorganization of the debtor. Because this is a liquidation under Chapter 7, there will be no reorganization. The only question faced by the bankruptcy court, then, was whether the debtor had equity in the property.

Hearings to determine whether the stay should be lifted are meant to be summary in character. The statute requires that the bankruptcy court's action be quick. If no action is taken on a motion for relief from the stay within thirty days of its filing, the stay is considered lifted. § 362(e). A preliminary hearing on the motion within the thirty days will prevent the automatic dissolution of the stay, but a final hearing must be commenced within thirty days after the conclusion of the preliminary hearing. *Id.* Unless the bankruptcy court denies the motion to lift the stay within thirty days after the commencement of a final hearing, or orders the stay continued pending conclusion of the hearing, the stay is considered lifted. Bankruptcy Rule 4001(a)(2). Many cases hold that the issues considered at a § 362 hearing are limited strictly to adequacy of protection, equity, and necessity to an effective reorganization. *See, e.g., Matter of Johnson,* 756 F.2d 738, 740 (9th Cir.), *cert. denied* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985); *Matter of Ellis,* 60 B.R. 432 (9th Cir. BAP 1985); *Matter of Quality Electronics Centers,* 57 B.R. 288 (Bankr.N.M.1986) (inquiry at § 362 hearing is limited to whether creditor had a colorable claim to a perfected security interest). This conforms with the legislative history of § 362.

At the expedited hearing under subsection (e), and at all hearings on relief from the stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 344 (1977), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6300.

In this case, then, the only issue properly before the court on the motion to lift the automatic stay was whether Vitreous had any equity in the real estate. To answer that question, the court had to determine (1) the value of the real estate and (2) the amount of money owed the Bank. If the debt was greater than or equal to the value of the realty, then the stay was properly lifted.

■■■■ The Trustee argues that the bankruptcy court erred in both of those determinations. She argues that it was error to use 20–day known distress forced liquidation value as the measure of the value of the property, and she also contests the amount of money owed the Bank. Initially we turn to the issue of the valuation of the real estate. Property valuations in bankruptcy are "determined in light of the purpose of such valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use." § 506(a). Valuation is a question of fact, and can be overturned on appeal only if clearly erroneous. *Bank Hapoalim v. E.L.I. Ltd.,* 42 B.R. 376 (N.D.Ill.1984). The bankruptcy court found that in view of the decline of the "smokestack industries," the long time similar businesses had remained on the market, and the large amounts of money Vitreous was losing, a fast sale was in the best interests of all concerned. Although a 20–day exposure to the market strikes us as a short time, the bankruptcy court's selection of that period as the best balance between the need for time to wait for the best offer and the need to stem losses from continued operations does not leave us with "the defi-

nite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), *quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Neither was it clear error to find the $350,000 valuation for a 20–day sale to be credible. Therefore, the valuation of the real estate at $350,000 was not clearly erroneous.

We turn next to the Trustee's other challenge to the lifting of the stay. The Bank claimed a debt of $1,027,781.85 on November 1, 1986. This debt was said to be secured by a security interest in all of Vitreous' personal property and by a first mortgage on the real estate. After the surrender and sale of the personalty at a price of $677,781.85, the Bank claimed a debt of $350,000 secured by the mortgage. It was the Bank's burden to demonstrate that it was owed that amount. *Matter of Johnson*, 45 B.R. 618 (Bankr.Md.1985). The bankruptcy court was satisfied that the Bank had successfully fulfilled its burden. The Trustee argues that this decision was clearly erroneous. She makes a point of the fact that the financing statement filed with respect to the Bank's debt did not cover after-acquired equipment, and argues that because the Bank's security interest in that property was not perfected at the time the bank took possession, retention of that property constituted a conversion, at least in regard to the equipment acquired after the date of the financing statement.

█ If the Trustee were correct in her assertion, then the bankruptcy court's finding would indeed have been clearly erroneous. The remedy for a conversion is the payment to the injured party of the fair market value of the converted goods as of the time of the conversion. *THQ Venture v. SW, Inc.*, 444 N.E.2d 335, 340 (Ind.App. 1983). Because the bankruptcy court allowed only the liquidation value of all repossessed property to count against the Bank's debt, there could be some difference between the actual amount of the debt and the amount as calculated by the bank-

ruptcy court. The bankruptcy court found that, after sale of all the personalty at liquidation value, the debt stood at $350,-000, which was exactly equal to the liquidation value of the realty. It follows that the difference between the liquidation value of the after-acquired equipment and its fair market value could be somewhat in excess of the amount owed the Bank. This amount would be the estate's equity in the remaining asset, the real estate.

█ We disagree that there was a conversion. Even though the Bank's security interest was not perfected under the Indiana enactment of the Uniform Commercial Code, Ind.Code § 26–1–9–303, as of the date of voluntary surrender, the security interest had attached under Ind.Code § 26–1–9–203. As a result, at the time of the surrender, the security agreement was enforceable as between the parties (the Bank and Vitreous) but was unenforceable against third parties. An unperfected security interest is subordinate to the rights of a later lien creditor, Ind.Code § 26–1–9–301, including the Trustee in her role as secured creditor, § 544(a)(1), but is enforceable between the parties. Ind.Code §§ 26–1–9–201, 26–1–9–203, 26–1–9–301. The act of taking possession of Vitreous' personal property not only served to enforce the security agreement between the Bank and Vitreous (which did cover the after-acquired personal property), but also served to perfect the Bank's security interest in all the voluntarily surrendered goods. Ind.Code § 26–1–9–305 states that "[a] security interest in ... goods ... may be perfected by the secured party's taking possession of the collateral." Because this form of perfection was completed prior to the filing of the involuntary petition commencing the case, and the Trustee stands in the shoes of a *later* creditor with a perfected security interest as of the date of the petition under § 544(a)(1), the Trustee has no claim superior to that of the Bank in any of the goods covered by the security agreement and then in possession of the Bank. Ind.Code § 26–1–9–301. It follows that the Bank could dispose of all the collateral, including the after-acquired equipment, in a commercially reasonable manner

and apply the proceeds to the reduction of its debt. Ind.Code § 26–1–9–504(1). Because there was no conversion, the Bank had a colorable claim that it was in fact owed $350,000, leaving no equity in the real property for the estate. The bankruptcy court acted properly in granting the Bank's motion to lift the automatic stay.

### III. ADVERSARY COMPLAINT

The bankruptcy court granted the Bank's and Champlin's motions for summary judgment on all counts of the eight-count adversary complaint. Judgment was granted on Counts I through VI on the basis of the preclusion doctrines of res judicata and collateral estoppel. The bankruptcy judge held that the issues had been previously determined in the hearing on the motion to lift the stay. We hold that the determination of the § 362 motion is not a bar to the prosecution of the adversary complaint.

■■■■ As the bankruptcy court correctly stated, a hearing on a motion to lift the automatic stay under § 362(d) is limited in scope. Questions of the validity of liens are not generally at issue in a § 362 hearing, but only whether there is a *colorable* claim of a lien on property of the estate. *Matter of Quality Electronics Centers*, 57 B.R. 288 (Bankr.N.M.1986). The doctrine of collateral estoppel bars relitigation of issues that were actually and necessarily decided in prior litigation between the parties. *White v. Elrod*, 816 F.2d 1172, 1174 (7th Cir.), *cert. denied*, 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987). The doctrine of res judicata bars suit on matters which were raised or could have been raised in previous litigation between the parties. *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981). Collateral estoppel is not a bar because the only issues necessarily decided at the § 362 hearing were whether the Bank had a colorable claim of a lien and whether the amount of that lien exceeded the value of the property. It was not necessary to reach questions of whether Champlin had colluded with the Bank, or questions of preferential transfers under § 547, or questions of

fraudulent conveyances under § 548, or questions of commercial reasonableness of the sale under state law. Indeed, none of these issues could properly have been raised, and therefore the § 362 hearing was not res judicata as to those issues. *See* Collier on Bankruptcy ¶ 362.08 (15th ed.).

### A. PREFERENTIAL TRANSFER, COUNT I

In Count I of the adversary complaint, the Trustee charged that the surrender to the Bank within 90 days before bankruptcy of goods acquired by Vitreous after 1981 (and therefore not covered by the Bank's financing statement) constituted a preferential transfer under § 547 of the Bankruptcy Code. The possible avoidability of a transfer to a creditor under § 547 is not part of the inquiry a court is required to conduct on a motion to lift the stay as we have described above. It follows that any decision on whether the repossession was avoidable was not necessary to the judgment on the § 362 motion, and we believe the bankruptcy court was in error barring litigation of this claim under the doctrine of collateral estoppel. The court should have considered the Trustee's arguments.

■■■■ To avoid a transfer under § 547, the Trustee must show that the transfer (1) was to or for the benefit of a creditor; (2) was on account of an antecedent debt; (3) was made while the debtor was insolvent; (4) was made within 90 days before the filing of the bankruptcy petition; and (5) allowed the creditor to receive more than it would receive in a distribution under Chapter 7 of the Bankruptcy Code. § 547(b). There is no controversy concerning the first four elements. There certainly was a transfer to a creditor on account of an antecedent debt within 90 days before bankruptcy, and all parties agree that Vitreous would not have been able to pay all creditors the entire amount they were owed. The only possible issue, then, is whether the Bank's position was improved when it took possession of the equipment in which it did not have a perfected security interest.

The answer is that it did improve its position. The Bank claimed that the value of the property repossessed (including the real estate) exactly equalled the amount Vitreous owed. To the extent that the Bank perfected its security interest in some of the property it repossessed, it improved its position in bankruptcy. Had the security interest in the after-acquired equipment not been perfected before the filing of bankruptcy, the security interest would have been unenforceable against the Trustee. Because the bankruptcy court found that the liquidation value of all of its collateral exactly equalled the amount of the Bank's debt, there would necessarily be some shortfall if some of those assets had to be shared by all the creditors. The Bank would collect only its proportionate share along with the other creditors in a Chapter 7 liquidation, and because the items in question are the only assets remaining in the estate, it is not possible that unsecured creditors will receive 100% of the value of their claims. By taking the transfer of the goods not covered in the financing statement (i.e., by perfecting its security interest), the Bank improved its position by that increment.

There are no genuine issues of material fact in regard to this count, and this court thus may direct the entry of judgment for either party. 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.12 (2d ed. 1988). It is undisputed that the transfer of possession was for the benefit of a creditor, § 547(b)(1), on account of an antecedent debt, § 547(b)(2), made while the debtor was insolvent, § 547(b)(3), § 547(f), and made within ninety days before the filing of the bankruptcy petition.[4] The transfer enabled the transferee to receive more than it would have otherwise received in a Chapter 7 liquidation, § 547(b)(5). There is no other factual issue that need be decided to determine whether a transfer may be avoided. The record holds no support for any contention that one of the exceptions to avoidance contained in § 547(c) existed. We therefore direct that on remand judgment in an appropriate amount be determined and entered in favor of the Trustee on this count of the complaint.

### B. FRAUDULENT CONVEYANCE, COUNTS II AND III

A transfer may be avoided as fraudulent under 11 U.S.C. § 548[5] for either of two reasons: actual intent to delay, hinder or defraud creditors, § 548(a)(1), or the production of less than reasonably equivalent value for the estate, § 548(a)(2). The Trustee raised both prongs of § 548 in separate counts of the adversary complaint. The bankruptcy court rejected the actual intent to defraud claim, relying on its finding at the § 362 hearing that Champlin and the Bank had not acted collusively. This was error. Allegations of collusion between the lienholder and the buyer at liquidation are not within the narrow scope of the § 362 inquiry. It does not speak to whether the lienholder has a colorable claim—indeed, it assumes that the lienholder does have some claim. Before a question of the propriety of the conduct of a sale under Ind.Code § 26–1–9–504 is reached, it must be assumed that the seller, the lienholder, has a legitimate legal right to conduct some sort of sale. Therefore the finding at the § 362 hearing that the Bank and Champlin had not colluded was not necessary to the decision, and therefore is not to be given preclusive effect under the doctrine of collateral estoppel. *White v. Elrod*, 816 F.2d 1172, 1174 (7th Cir.), *cert. denied*, 484 U.S. 924, 98 L.Ed.2d 246 (1987). The court should have considered the Trustee's arguments.

---

**4.** It is not necessary in this case to consider whether the Bank was an insider within the meaning of § 547(b)(4)(B) because the transfer occurred so soon before the filing of bankruptcy that the distinction is irrelevant. A transfer occurring within ninety days before bankruptcy is avoidable under § 547 even if the transferee is an outsider.

**5.** The Trustee may also have additional powers to avoid fraudulent transfers using the "strong-arm clause" of 11 U.S.C. § 544(a), giving the Trustee the powers of a judicial lien creditor, a judgment creditor, and a bona fide purchaser of real property. This provision allows the Trustee to use applicable state law to avoid certain transfers.

With all due respect to the superior opportunity of the bankruptcy court judge to observe the demeanor of witnesses and to make credibility determinations, we are troubled by the court's finding that the Bank and Champlin had not acted collusively. The chronology of events leading up to the repossession and sale of Vitreous' assets in our opinion is suspect. Two days before repossession Champlin created a new corporation to compete directly against Vitreous, of which he was already majority shareholder and sole director. One day before repossession he took over $13,000 from the corporate treasury for "expenses." On the same day he voluntarily turned all of Vitreous' assets over to the Bank, he obtained a contract to run the same business he had before, but now with a $2500 per week management fee. The time allowed by the Bank for sale to pay off Vitreous' debt did not leave enough time for an outside buyer to both decide the business was a good investment and allow an outside lender to do the necessary due diligence. Even though the Bank demanded cash in hand from the other bidders, the sale to Champlin and VITCO was a cashless transaction. If the Bank was willing to take the risk of Champlin running the business without further supply of outside money, why would they threaten to repossess? The only answer we can see is that the Bank and Champlin wanted the business shed of unsecured debt. The record contains Champlin's statement that in order for the company to succeed, "you had to eliminate a good deal of that [general] debt." If elimination of the unsecured debt was the Bank's motive, then the Bank did act collusively to delay or defraud the unsecured creditors. *Matter of Met–L–Wood*, 861 F.2d 1012, 1019 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989); *Matter of Ambassador Riverside Investment Group*, 62 B.R. 147 (M.D.La.1986). The court should carefully reexamine this question on remand.

The other branch of fraudulent transfer analysis is whether the estate received substantially equivalent value from the transfer. § 548(a)(2). Our analysis is complicated by the lack of a specific finding by the bankruptcy court on the value of the personalty. Without such a finding, we are without a figure against which we can compare the price received. Because there never was a finding of fact on this issue at the § 362 hearing, the § 362 hearing cannot preclude litigation of the question of equivalent value. We therefore reverse the grant of summary judgment as to this count, and remand for a determination of the value of all property sold and a comparison of that value to the price received.

## C. COMMERCIAL REASONABLENESS, COUNT IV

To determine whether a foreclosure sale was commercially reasonable under Ind.Code §§ 26–1–9–501 *et seq.*, the court must inquire into not only the price received at the sale, but also into the regularity of the advertising and conduct of the sale. The details of a potential sale that may occur after the lifting of the automatic stay should not be considered in the analysis of whether the stay should be lifted. Therefore it was unnecessary for the bankruptcy court to consider the reasonableness of the price received or the reasonableness of the manner in which the sale was conducted at the hearing on the motion to lift the stay. Thus the Trustee should not have been precluded from establishing in an appropriate forum that the Bank disposed of its collateral in an unreasonable manner or for an unreasonable price. On remand, the court should consider the Trustee's arguments.

## D. CONVERSION, COUNT V

In our discussion of the estate's equity in the Vitreous real property, *supra* pp. 1233–1234, we explained that the Bank's repossession resulting from the voluntary surrender of the equipment not covered by the Bank's financing statement was not a conversion under Indiana law. The entry of summary judgment for the Bank was proper because there is no genuine issue of material fact surrounding the repossession. Even though the bankruptcy court incor-

rectly applied the doctrine of res judicata to reach its result, this court may affirm a judgment for other reasons supported in the record. *Shields v. Burge*, 874 F.2d 1201 (7th Cir.1989).

## E. EQUITABLE SUBORDINATION, COUNT VI

 Even if the bankruptcy court had found collusive conduct between the Bank and Champlin at the § 362 hearing, that finding would not have destroyed the Bank's claim or its lien, nor the Bank's priority in bankruptcy if the stay were kept in place. The issues involved in determining whether the automatic stay should be lifted have nothing to do with priorities between creditors inside the bankruptcy proceedings. Therefore the issue of whether the Bank's claim should have been equitably subordinated to the claims of the general creditors under § 510(c) was not necessary to the § 362 decision. Thus the grant of summary judgment on grounds of collateral estoppel was improper. On remand, the bankruptcy court is obligated to make findings of fact as to whether the Bank's actions call for subordination of its debt under the balancing test of *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977). The court should consider whether (1) the claimant creditor has engaged in some sort of inequitable misconduct; (2) the misconduct has resulted in injury to other creditors or in unfair advantage to the miscreant; and (3) subordination of the debt is inconsistent with other provisions of the bankruptcy code. We recently held in *Matter of Virtual Network Services Corp.*, 902 F.2d 1246 (7th Cir.1990), that it is not necessarily required that the creditor be found to have engaged in misconduct. We stated that the inquiry is to be made on a case-by-case basis focussing on fairness to the other creditors. The court should consider all the circumstances in determining whether the Bank's claim should be subordinated to that of the general creditors.

## F. EFFECT OF THE WEIL TRUST NOTE, COUNT VII

This count, as we have noted *supra* footnote 3, was ignored as moot by the courts below. Because the Trustee has succeeded on at least one count of the adversary complaint, there is something in the estate for distribution to other creditors, and the viability of the Weil Trust note, now held by Champlin, is a question of importance to the unsecured creditors. The record is not exactly clear as to whether the Note is still secured. When Champlin signed the Bank's mortgage of November 1, 1986, he promised that that mortgage constituted a first lien on the property. The record is silent as to whether Champlin has in fact released the collateral pertaining to the Weil Trust loan he purchased on July 10, 1986. If the note is enforceable and the collateral has not been released, then the Weil Trust debt has priority over all other claims to proceeds from sale of the property. If the note is enforceable and the collateral has been released, there is another major unsecured creditor (Champlin) with a right to share in the distribution of the estate.

 The note provides that payment cannot be made if the payment would cause Vitreous to be in violation of its loan agreement with the Bank. That agreement provides that Vitreous may make payments on the Trust note only from profits from the preceding quarter, and only when the loan from the Bank is not in default. But the note also includes this provision:

It is understood that the provisions hereof are intended solely for the purpose of defining the relative rights of the holder of this Note, on the one hand, and the Bank as holder of the "Senior Indebtedness" on the other hand. Nothing contained herein is intended, or shall impair, as between Vitreous and its creditors other than the Bank, the obligation of Vitreous which is unconditional and absolute, to pay the Trustee [of the Weil Trust] the principal of and interest on this Note as and when the same shall become due and payable in accordance with the terms hereof.

The interpretation of an unambiguous contract is a matter of law, *International*

*Ass'n of Machinists v. General Electric,* 865 F.2d 902 (7th Cir.1989), and if this contract is unambiguous this court can direct the entry of summary judgment for the proper party. Whether a contract is ambiguous is a question of law, which this court decides *de novo. Samuels v. Wilder,* 871 F.2d 1346 (7th Cir.1989). Nonetheless, we are without the benefit of the opinions of the courts below on these questions, and the parties have not fully argued them before us. Because of the limited record before us, we do not feel we are in a position to proceed. Thus we remand this question to the bankruptcy court for the development of a complete record and sufficient findings of fact.

## G. COUNT VIII, CHAMPLIN'S EXPENSE MONEY

██ The bankruptcy court rejected the Trustee's claim that the payment to Champlin of $13,800 on the day before the Bank repossessed all of Vitreous' assets constituted a fraudulent transfer on the grounds that, at that time, Vitreous was paying all its debts as they came due, and was therefore not insolvent within the meaning of § 548(a)(2)(B)(i). While it is true that, after Champlin took over the operations of Vitreous, Vitreous paid for all new purchases on a cash basis and paid all new bills as they became due, it is also true that Vitreous did not pay anything on debts which had become due before July 10, 1986. Vitreous was in default to the Bank, and was also sufficiently in default to other creditors to become the subject of an involuntary Chapter 7 proceeding. Given the bankruptcy court's almost simultaneous finding that the value of all of Vitreous' assets was only sufficient to pay off the Bank without a penny left over for the remaining creditors, the finding that Vitreous was not insolvent at the time of the payment to Champlin was clearly errone-

ous. Furthermore, the record fails to set forth an itemized listing of expenses for which Champlin was being reimbursed. He claimed in his testimony at the § 362 hearing that the money was for travel expenses incurred "some time back," but Champlin had been an employee of Vitreous only since July 10, 1986. That meant that between that time and August 29, 1986 when VITCO began operating the plant for the Bank, there was only a period of fifty days during which Champlin could have been travelling as a Vitreous employee before the reimbursement—hardly "some time back." The large amount of the reimbursement suggests that it might very well have taken more than fifty days to incur the amount of debt. That in turn suggests that Champlin may have taken reimbursement from Vitreous for expenses he incurred in taking control of the company. The company itself got no benefit from a transfer of its stock on the secondary market, and can hardly be said to have received "equivalent value" within the meaning of § 548(a)(2)(A) when it paid for such a transfer. On remand the bankruptcy court should demand an account of all the expenses claimed and paid out and from this information and other information gained at a full and complete hearing determine whether Vitreous received reasonably equivalent value for the August 28, 1986 transfer of $13,800 to Champlin.[6]

## IV. CONCLUSION

This case was victimized by confusion at the outset. Had all parties understood and limited themselves to the proper scope of the § 362 hearing the problems encountered here might not have arisen. The scope of a hearing on a motion to lift the automatic stay is quite narrow; the issues to be heard are limited to those specified in the statute. The court hearing a motion of this nature looks only to determine wheth-

**6.** The payment to Champlin may have constituted a voidable preference under 11 U.S.C. § 547, in some respects a case easier to establish than a fraudulent transfer. Vitreous was clearly insolvent, and the transfer to the insider was within a year before the filing of the bankruptcy petition. The payment was not for a contemporaneous exchange of value (as Champlin was be-

ing reimbursed for expenses incurred "some time back"). The Trustee has an additional burden under § 548 of demonstrating that the transfer was for less than equivalent value. That value could be the release of a just claim against the corporation. With the voidable preference approach, no such showing need be made.

er the party seeking to lift the stay has a colorable claim on property of the estate, and does not undertake a complete examination of all the estate's possible defenses. Therefore rulings on the estate's defenses are not necessary to the court's decision on the motion to lift the stay, and do not have preclusive effect in a later adversary proceeding. We hold that the bankruptcy court in this case acted properly in granting the motion to lift the stay, but acted improperly in cutting off the Trustee's later adversary complaint. Except for the issue of conversion, where we held that the undisputed facts required judgment for the Bank, and the issue of preferential transfer of assets not covered by the Bank's financing statement, where we held that the undisputed facts required judgment for the Trustee, we remand the adversary complaint to the bankruptcy court for a full detailed and complete hearing on the merits.

So Ordered.