**AETNA BANK, Appellee,**

v.

**Thomas DVORAK and Karen Dvorak, Appellants.**

Nos. 94 C 2503, 92 B 6544.
Adv. No. 93 A 1632.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 15, 1994.

Andrew D. Werth, DiMonte & Lizak, Park Ridge, IL, for appellants.

Ronald A. Damashek, Holleb & Coff, Chicago, IL, for appellee.

### *MEMORANDUM AND ORDER*

MORAN, Chief Judge.

This case is an appeal from a decision of the United States Bankruptcy Court pursuant to 28 U.S.C. § 158(a). Appellee Aetna Bank (Aetna) and appellants Thomas and Karen Dvorak (the Dvoraks) are among many parties involved in a dispute over proceeds from the liquidation of property formerly owned by the McDonald Creek Development Company (McDonald Creek), the debtor in bankruptcy. On January 10, 1994, Aetna moved for summary judgment against the Dvoraks, arguing that its properly recorded mortgage interest in the residential property known as Lot 2 has a higher priority than the Dvoraks' lien interest in that property. The bankruptcy court granted Aetna's motion on March 11, 1994. The Dvoraks now appeal to this court, advancing three arguments to convince us that the bankruptcy court erred. For the reasons set forth below, we affirm the bankruptcy court's decision.

## FACTS [1]

In 1990 the debtor, McDonald Creek, entered into a plan to develop a plot of land in Arlington Heights, Illinois, into a residential subdivision consisting of ten lots and two outlots. The purchase of land for this subdivision was initially financed through Aetna, which acted as both the principal lender and the trustee of the land trust McDonald Creek used to manage the property. In addition to the purchase money Aetna loaned McDonald Creek money to finance the construction of homes on the property. In exchange, the land trustee conveyed to Aetna a note worth $1,435,000 and a mortgage on McDonald Creek's interest in the property. The mortgage was properly recorded on September 6, 1990. The loan agreement and mortgage provided that payments received from purchasers of the subdivided lots were to be paid to Aetna.

In early June 1991, the Dvoraks signed a contract with McDonald Creek to purchase a single-family home to be built on Lot 2 of the subdivision. The purchase price was $340,000. Three installments of ten percent each were to be paid at successive stages of the home's construction, with the balance due at closing.

On September 11, 1991, the Dvoraks' attorney requested information from Aetna, as land trustee and mortgagee, regarding the status of payments under McDonald Creek's note and mortgage. On October 1, 1991, Aetna responded that it was prohibited by law from disclosing information about a customer. Aetna suggested that the Dvoraks contact McDonald Creek to obtain the information they sought.

Meanwhile, by September 19, 1991, the Dvoraks had paid McDonald Creek $102,000, which was 30 percent of the total purchase price. Between then and November 8, 1991, they paid an additional $15,113 to cover cement, plumbing, and various upgrades. As provided in McDonald Creek's loan agreement, these payments were made directly to Aetna. Progress on the home stopped by November 1991, and the Dvoraks, in an effort to protect their interest in Lot 2, record-ed their real estate contract with the recorder of deeds on November 12, 1991.

On March 20, 1992, McDonald Creek filed a bankruptcy proceeding pursuant to Chapter 11 of the Bankruptcy Code. Its only material asset was its beneficial interest in the land trust that was holding legal title to the subdivision. Under the bankruptcy court's supervision some of the subdivision lots were sold to contract purchasers, and the others were sold to third-party buyers. The property brought in $1,200,000, and the bankruptcy court must now determine the priority of interests. Aetna Bank and various mechanics lienholders are claiming approximately $1,200,000 and $400,000, respectively, in liens on these funds.

Aetna and the Dvoraks agree that the Dvoraks have a lien on the proceeds from the sale of the McDonald Creek property pursuant to 11 U.S.C. § 365(j). Section 365(j) provides that

> [a] purchaser that treats an executory contract as terminated under subsection (i) of this section, or *a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession,* has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.

11 U.S.C. § 365(j) (emphasis added). Both parties agree that the Dvoraks had a contract for the purchase of real estate, that the contract was executory, and that the debtor, McDonald Creek, rejected the contract. They disagree over the priority the lien carries. On January 10, 1994, Aetna moved for summary judgment in the bankruptcy court, arguing that its prior recorded mortgage lien had a higher priority than the Dvoraks' § 365(j) lien. After the issue was fully briefed, the bankruptcy court heard oral argument, then granted the motion. The Dvoraks now appeal that decision to this court, arguing that their lien deserves priority over Aetna's.

---

1. Unless otherwise noted, the facts relevant to this appeal are not in dispute and are recited here as they appear in the Dvoraks' brief. *See* Appellants' Brief at 4–9.

## DISCUSSION

When deciding an appeal from a bankruptcy court, a district court must accept the bankruptcy court's findings of fact unless they are clearly erroneous. *In re Evanston Motor Co.*, 735 F.2d 1029, 1031 (7th Cir.1984); *In re Robinson*, 169 B.R. 171, 174 (N.D.Ill.1994). But "where there are pure questions of law or mixed questions of law and fact, the District Court may conduct a *de novo* review." *In re Mader*, 108 B.R. 643, 644 (N.D.Ill.1989). Because the decision below involved only purely legal and mixed law/fact questions, we conduct *de novo* review.

The Dvoraks challenge the bankruptcy court's decision on three grounds. Their first argument is that the lien provided them takes priority over Aetna's lien because Congress intended § 365(j) liens to protect the investments of nondebtor vendees of real property when the vendor goes bankrupt. By treating their § 365(j) lien as a typical lien, the Dvoraks say, the bankruptcy court subverted Congress' attempt to protect unsophisticated land purchasers (Appellants' Brief at 12–16). Because we do not believe that Congress intended § 365(j) to provide a lien with special priority as a remedy, we reject the Dvoraks' position.

In interpreting any statute, the logical starting point is the plain language the legislature used. *Reves v. Ernst & Young*, — U.S. —, —, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993) (" 'In determining the scope of a statute, we look first to its language.' ") (quoting *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)); *United States v. Hayward*, 6 F.3d 1241, 1245 (7th Cir.1993) ("A court's starting point to determine the intent of Congress is the language of the statute itself....."), *cert. denied*, — U.S. —, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994). Section § 365(j) does not specify what priority the lien it creates should receive. It says only that the vendee is entitled to "a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid." 11 U.S.C. § 365(j). The absence of any reference to lien priority in the plain

language is our first clue that Congress did not intend to give holders of § 365(j) liens any special treatment other than to create the lien in the first place.

Our second clue is the legislative history of § 365(j). If the legislative history made clear that Congress intended something more than it explicitly said in § 365(j), we might be persuaded to interpret the statute more broadly than its plain language suggests. *See Hayward*, 6 F.3d at 1245–46 (suggesting that where plain language does not definitively settle an issue, a court may seek guidance in the overall statutory scheme and the legislative history); *In re Stoecker*, 117 B.R. 342, 346 (N.D.Ill.1990) ("In the absence of express language in a statute, courts should examine legislative history for possible authority to support an implication."). But the legislative history offers no such support for the Dvoraks' position. It is certainly true that § 365(j) was intended to protect nondebtor vendees in executory land sale contracts. Prior cases, beginning with *In re New York Investors Mutual Group, Inc.*, 143 F.Supp. 51 (S.D.N.Y.1956), had "suggested that upon rejection of an executory contract by the debtor-vendor the purchaser would lose its right in the real property it was purchasing and be left with only an unsecured claim for the portion of the purchase price already paid." *In re McDaniel*, 89 B.R. 861, 873 (Bankr.E.D.Wash.1988). This result was thought to be unjust, and §§ 365(i) and 365(j) were adopted to avoid it. *Id.* But we have found no evidence that the protection embodied in § 365(j), a lien on the debtor's interest in the property that was the subject of the executory contract, was meant to include a special priority for that lien. Neither the Senate Report on the statute nor the House of Representatives Report says anything about altering preexisting priorities law. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 60 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5846 (saying only that the vendee "has a lien on the property to secure the price already paid"); H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 350 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6306 (same); *see also* Frank R. Lacy, *Land Sale Contracts in Bankruptcy*, 21 UCLA L.Rev. 477, 490,

511 (1973) (published version of working paper on which Commission on the Bankruptcy Laws of the United States based its recommendations for § 365(j)) (advocating statute granting lien but not proposing any special priority for such a lien). Finding no indication to the contrary, then, we must assume that Congress meant no more than what it plainly said—that the vendee should receive a lien on the interest of the debtor. As one court put it:

> Section 365(j) is intended to give a limited form of protection to the non-debtor vendee upon rejection of the [land sale] contract. That protection is restricted to a lien covering only the debtor's interest in the property forming the subject of the rejected contract.... If Congress had intended that the disappointed vendee be given an administrative priority or other forms of adequate protection in addition to or in lieu of the lien granted by Section 365(j), it surely could have done so but it did not. In effect the lien is the "adequate protection" Congress has chosen to protect the debt owed to such a vendee. No amount of alchemy can transform that congressionally mandated protection into something greater than it is, a lien against the property and nothing more.

*Delta Energy Resources, Inc. v. Damson Oil Corp.,* 72 B.R. 7, 12 (W.D.La.1985). We conclude that § 365(j) does not alter the otherwise applicable priorities among secured creditors. Therefore, priority is left to the state priorities system, as is usually the case in bankruptcy. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *BFP v. Resolution Trust Corp.,* —— U.S. ——, ——, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556 (1994) (unless a bankruptcy statute clearly supplants state law, "the Bankruptcy Code will be considered to adopt, rather than displace, pre-existing state law"). Illinois property law places recorded interests, such as Aetna's mortgage, ahead of subsequent interests and liens. *See* 765 ILCS 5/30 ("All deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record"); *Life Savings & Loan Association of America v. Bryant,* 125 Ill. App.3d 1012, 81 Ill.Dec. 577, 582, 467 N.E.2d 277, 282 (1984). Aetna's mortgage was recorded on September 6, 1990. At that time the Dvoraks had not even signed their contract with McDonald Creek, so their lien could not yet have arisen.[2] Therefore, the bankruptcy court correctly concluded that Aetna's mortgage has priority over the Dvoraks' lien.

We are aware of the hardship this decision imposes on the Dvoraks. They spent a considerable sum to purchase a new home, received nothing in return, and now must watch as their money is distributed among the developer's other creditors. Unfortunately, McDonald Creek's bankruptcy is a situation in which someone must lose; there simply is not enough money to cover the company's debts. Congress made the decision in § 365(i) to protect land sale vendees-in-possession by allowing them to receive title from the debtor-vendor upon payment of the agreed-upon sum for the property, but in § 365(j) it gave vendees not in possession (like the Dvoraks) only a place in line with the debtor-vendor's other secured creditors. Despite the apparent inequity to the Dvoraks, we are bound by Congress' choice.

■ The Dvoraks' second argument is that the bankruptcy court erred in failing to invoke equitable subordination in its favor. The doctrine of equitable subordination be-

---

**2.** It is not clear when the law would deem the Dvoraks' claim to have arisen. Reasonable arguments could be made that the lien was effective as of the day the debtor filed for bankruptcy, the time the Dvoraks made their payments, or the time McDonald Creek rejected its land sale contract with the Dvoraks. It is also possible that Congress intended § 365(j) liens to have the very lowest priority of all secured interests in the bankruptcy estate; after all, the statute gives the claimant "a lien on the interest of the debtor in [the] property," 11 U.S.C. § 365(j), and the debtor's interest is subordinate to those of all the other secured creditors. The facts of this case do not require us to determine which of these approaches is correct.

gan as a judicial construct, but was later incorporated into the Bankruptcy Code as 11 U.S.C. § 510(c). It permits courts to subordinate the otherwise superior claim of one creditor to that of another creditor where the first creditor has gained an unfair advantage over the second. *See Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1350–51 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). In deciding whether to apply the doctrine courts should consider (1) whether the first creditor engaged in any inequitable misconduct, (2) whether that misconduct resulted in injury to other creditors or an unfair advantage to the miscreant, and (3) whether subordination of the first creditor's debt would be inconsistent with other provisions of the Bankruptcy Code. *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1237 (7th Cir.1990). The inquiry should be made on a case-by-case basis, focusing on fairness to all the creditors. *Id.*

The Dvoraks claim that Aetna acted inequitably by encouraging them to make payments on their home when it knew that McDonald Creek was in trouble and that construction would not be completed. Aetna then used the Dvoraks' money to help pay off its primary mortgage on the McDonald Creek property, thereby protecting its own interests. The Dvoraks say that Aetna's actions injured them by prompting them to make more payments than they otherwise would have. In the interest of fairness, they argue, Aetna's interest in the proceeds of the McDonald Creek property should be subordinated to their lien (Appellants' Brief at 18–20).

■ This argument fails for several reasons.[3] First, the Dvoraks do not provide any evidence of wrongdoing. Although such evidence is not a *sine qua non* of equitable subordination, *In re Virtual Network Services Corp.*, 902 F.2d 1246, 1247–48 (7th Cir. 1990), it is certainly an important element. *Vitreous Steel*, 911 F.2d at 1237. Here the best evidence of wrongdoing that the Dvoraks can produce is that Aetna refused to

reveal information to them about McDonald Creek. There is no allegation of misrepresentation, much less the inside activity or undue influence that usually spurs equitable subordination cases. *See Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir.1990) ("Equitable subordination is usually a response to efforts by corporate insiders to convert their equity interests into secured debt in anticipation of bankruptcy."). Even for the Dvoraks to say that Aetna encouraged them to continue making payments is a stretch. The most that can legitimately be said is that Aetna failed to discourage the payments, and it is doubtful that such inaction could rise to the level of wrongdoing in the absence of any duty owed by Aetna to the Dvoraks.

Even if it could otherwise be considered wrongdoing for Aetna to refuse to provide information to the Dvoraks, it clearly could not in this case since an Illinois statute prohibited Aetna from disclosing any information relating to its dealings with McDonald Creek. That law provides that except under certain circumstances not applicable here "[a] bank may not disclose to any person, except to the customer or his duly authorized agent, any financial records relating to that customer of that bank." 205 ILCS 5/48.1(c). Financial records are defined to include "any ... item containing information pertaining to any relationship established in the ordinary course of a bank's business between a bank and its customer." *Id.* McDonald Creek, a typical commercial borrower, was a customer of Aetna and therefore was entitled to the protection of § 48.1(c). Thus Aetna did not engage in inequitable conduct by refusing to disclose information about McDonald Creek's financial status. On the contrary, it acted as it should have under Illinois law.

■ Finally, even if Aetna had committed some wrong, its refusal to divulge information about McDonald Creek was too insubstantial a factor in the Dvoraks' loss to justify equitable subordination. At the time of the refusal on October 1, 1991, the Dvoraks had already advanced $102,000 of the $117,-

---

**3.** Aetna claims that we should not even consider the equitable subordination claim because the Dvoraks did not raise it in the court below. Because we conclude that the bankruptcy court correctly ruled on the merits, we do not address this procedural issue.

113 that they eventually paid to McDonald Creek (Appellants' Brief at 5, A112). Therefore, the most damage for which Aetna could be held responsible is the Dvoraks' last payment of $15,113—less than 13 percent of the Dvoraks' total claim against McDonald Creek. And even with respect to that portion of the claim, Aetna's refusal to disclose information at worst played only a minor role in the Dvoraks' decision to pay McDonald Creek. All the bank did was to refuse to provide information; it did not actively encourage the Dvoraks to continue making payments and in fact suggested that they seek further information directly from McDonald Creek. The Dvoraks' decision to make the last payment was driven far more by their failure to investigate and uncover the truth about McDonald Creek than by Aetna's refusal to provide information. Therefore, equitable subordination, which should be invoked only in extreme circumstances and only where a clear inequity has been wrought, is inappropriate here. *See Abell v. First National Bank in Shawneetown,* 153 Ill.App.3d 946, 106 Ill.Dec. 884, 890–91, 506 N.E.2d 684, 690–91 (affirming summary judgment for lender because although lender's conduct may have been a cause in fact of the creditors' loss, the creditors had not presented sufficient evidence that the lender's conduct was a material and substantial factor in bringing about the loss), *appeal denied,* 116 Ill.2d 547, 113 Ill.Dec. 291, 515 N.E.2d 100 (1987); *First Bank of Whiting v. Kham & Nate's Shoes, No. 2, Inc.,* 104 B.R. 909, 911 (N.D.Ill.1989) ("Courts generally agree that equitable subordination is an extraordinary remedy which should not be invoked lightly."), *vacated on other grounds,* 908 F.2d 1351 (7th Cir.1990); *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.,* 25 B.R. 484, 499 (Bankr.S.D.Ohio 1982) ("Subordination is essentially a discretionary exercise of the Court's equitable powers, and should only be used sparingly to rectify obvious inequities."). For all of these reasons, we reject the Dvoraks' equitable subordination argument.

■ The Dvoraks' final argument is that the bankruptcy court should have imposed a constructive trust lien on the funds it paid to Aetna as installments on its real estate contract. A constructive trust arises when a court decides that it would be inequitable for a party in possession of wrongfully acquired property to retain possession. It then appoints the possessor as the constructive trustee of the property. The rightful owner of the property is the beneficiary of the constructive trust, and the possessor/trustee's sole duty is to transfer title and possession of the trust *res* to the beneficiary. *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.,* 114 Ill.2d 278, 102 Ill.Dec. 306, 313, 499 N.E.2d 1319, 1326 (1986).

■ We agree with Aetna that a constructive trust would not be appropriate in this situation. Illinois law allows constructive trusts where the property in question was acquired in one of three ways: actual fraud, abuse of a fiduciary relationship, or duress, coercion, or mistake. *Id.; see also Amendola v. Bayer,* 907 F.2d 760, 762–63 (7th Cir.1990) (concluding that Illinois law recognizes only these grounds for creating a constructive trust). As these three categories make clear, "[s]ome form of wrongful or unconscionable conduct is a prerequisite to the imposition of a constructive trust." *Id.* The Dvoraks do not provide us with any basis for saying that Aetna committed wrongdoing. They say only that by remaining silent Aetna encouraged the Dvoraks to continue making payments, to their ultimate detriment (Appellants' Brief at 19–21). As explained above, Aetna's refusal to disclose confidential information about McDonald Creek was not wrong, so this argument provides no basis for imposing a constructive trust.

The Dvoraks' last contention is their claim that Congress, by enacting §§ 365(i) and (j), intended for a constructive trust lien to be imposed over the proceeds from the sale of the property they contracted to buy (Appellants' Brief at 19–21). We find no more support for this assertion than for the Dvoraks' claim that § 365(j) gives them a special lien priority. There is nothing in the legislative history to suggest that Congress intended land vendees like the Dvoraks to receive

anything more under § 365(j) than a lien on the property or on the proceeds from its sale.

Both of the arguments the Dvoraks raise in support of their constructive trust claim are merely reiterations of arguments we have already rejected. Therefore, logic demands that we reject the constructive trust argument as well, particularly in light of the well-established Illinois rule that constructive trusts should not be imposed unless "the grounds for [doing so are] so clear, convincing, strong and unequivocal as to lead to but one conclusion." *Suttles v. Vogel,* 126 Ill.2d 186, 127 Ill.Dec. 819, 823, 533 N.E.2d 901, 905 (1988); *see also In re Stotler & Co.,* 144 B.R. 385, 388 (N.D.Ill.1992) (noting that "a constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code," at least in part because it upsets the statutory scheme of ratable distribution). The bankruptcy court did not err in failing to impose a constructive trust lien.

### CONCLUSION

For the foregoing reasons, the decision of the bankruptcy court is affirmed.