In the Matter of **REPOSITORY TECHNOLOGIES, INC.,** Debtor.

**Repository Technologies, Inc., Plaintiff,**

v.

**William C. Nelson, IV, Defendant.**

**Bankruptcy No. 06 B 04582.**
**Adversary No. 06 A 01247.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Feb. 13, 2007.

Steven J. Christenholz, DLA Piper U.S. LLP, Chicago, IL, Ann E. Pille, DLA Piper U.S. LLP, Chicago, IL, for William G. Nelson, IV, Defendant.

Jeffrey C. Dan, Crane, Heyman, Simon, Welch & Clar, Chicago, IL, Arthur G. Simon, Crane, Heyman, Simon, Welch & Clar, Chicago, IL, David K. Welch, Crane, Heyman, Simon, Welch & Clar, Chicago, IL, for Repository Technologies Inc., Plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

JACK B. SCHMETTERER,
Bankruptcy Judge.

The Debtor filed a four count Adversary Complaint against William G. Nelson IV ("Nelson") asserting causes of action by Repository Technologies, Inc. ("RTI" or "Plaintiff"): (1) for recharacterization of Nelson's loans to equity; (2) equitable subordination of Nelson's loan claims against the Debtor pursuant to Section 510(c)(1) of the Bankruptcy Code; (3) transfer of Nelson's liens to the Debtor's estate pursuant to Section 510(c)(2) of the Bankruptcy Code; and (4) recovery against Nelson for alleged breaches of his fiduciary duties owing to the Debtor, its creditors and its shareholders. This Adversary relates to the pending Chapter 11 Bankruptcy case filed by RTI.

The evidence admitted also relates to Debtor's pending objections to Nelson's Claim No. 6, which were asserted to rest on the issues asserted by RTI in the Adversary. These Findings and Conclusions therefore dispose of that claim objection.

Nelson filed a Dismissal Motion seeking dismissal of this Chapter 11 case, or, alternatively, relief from the automatic stay ("Stay Motion"). The trial on the Debtor's

Adversary Complaint was ordered to be consolidated with trial on the Stay Motion.

Shortly before commencement of trial. Defendant Nelson filed a Motion for Summary Judgment with respect to issues presented by the Adversary Complaint. After briefing by the parties on the eve of trial, and there appearing to be some triable issues of fact and even some relief that Plaintiff might obtain (and indeed some partial relief is allowed to Plaintiff by this ruling), Nelson's Motion for Summary Judgment was taken along with trial evidence for ruling after the parties rested without delaying to prepare a complete analysis of the motion.

At the start of trial, counsel for Debtor and Nelson agreed that facts identified by Nelson in his Statement of Uncontested Facts offered in support of his Motion for Summary Judgment, and the facts identified by Debtor in its Statement of Additional Facts offered in opposition to Nelson's Motion for Summary Judgment would be admitted into evidence as uncontroverted to the extent not objected to by the parties.[1]

After Debtor rested, Nelson moved for entry of judgment under Fed. R. Bankr.P. 7052. Ruling on Nelson's Motion was deferred until completion of trial. Again, there appeared to be some partial relief due Plaintiff, and the completion of trial was warranted. That Motion will now be stricken as mooted by the Final Judgment that will now be entered.

All of Debtor's Exhibits 1 through 30 were admitted into evidence. Nelson's Exhibits 1 through 20 and 25 through 33 were admitted into evidence. Nelson's Exhibits 21 through 24 and 34 were withdrawn by Nelson. Nelson's Exhibit 35, which was objected to by the Debtor, was never offered into evidence.

At the close of the trial evidence, both parties rested and the parties presented their final arguments in writing.

## FINDINGS OF FACT

### THE PARTIES

1. The Debtor ("RTI") is a Delaware corporation, with a principal place of business in Lisle, Illinois. RTI markets, supplies, and maintains software pursuant to the terms of various software licensing agreements with its customers.

2. Mr. Nelson is an individual with a principal residence located in Pennsylvania. Since 1996, Mr. Nelson has been a shareholder of RTI. In addition, Mr. Nelson served as Chief Executive Officer of RTI, and has served on RTI's Board of Directors from 1996 and as its Chairman through April 11, 2006, when he resigned.

3. After April 11, 2006, when Mr. Nelson resigned all formal positions with RTI, he only held positions as a shareholder and lender.

4. Since 1996, RTI's Board of Directors had between three and five directors and Mr. Nelson had only one seat on the Debtor's Board of Directors while the principal shareholders, E. James Emerson ("Mr.Emerson") and Kathleen Emerson ("Mrs.Emerson"), had two seats, so Mr. Nelson was never in control of the Board of Directors.

### THE BUSINESS OF REPOSITORY TECHNOLOGIES, INC.

5. RTI obtains revenue from three primary sources: (a) new sales of software licenses ("Licenses"); (b) upgrades of prelicensed software to customers with specialized needs ("Services"); and (c) maintenance and customer support of existing

---

1. Trial Tr., 65:10–67:14, Aug. 28, 2006.

software licenses ("Maintenance"). RTI currently has six full-time and two part-time employees. RTI currently has two corporate officers: Mr. Emerson and Mrs. Emerson.

6. Mr. Emerson, RTI's President, is responsible for keeping the books and records of RTI, including payroll and the tracking of employee reimbursements and expenses. Mr. Emerson and Mrs. Emerson own 37.02% and 29.82% of the equity interests in RTI, respectively, for a combined 66.84% of the equity interests.

7. In 2000, RTI had gross income of $2,132,562, and a net loss of $129,835. In 2001, RTI had gross income of $1,913,823, and a not loss of $273,368. In 2002, RTI had gross income of $1,586,897, and a net loss of $701,780. In 2003, RTI had gross income of $1,630,691, and a net loss of $791,771. In 2004, RTI had gross income of $1,406,835, and a net loss of $148,647, without taking into account any interest that might have been due and owing to Mr. Nelson on his loans to RTI. In 2005, RTI had gross income of $1,321,523, and a net gain of $159,967, without taking into account any interest on loans that might be due and owing to Mr. Nelson.

8. Mr. Emerson did not testify as an expert, but in his testimony stated his belief that RTI has a going concern value of a little less than $3,500,000, with actual going concern value most likely determinable based upon a multiple of RTI's earnings. No expert testimony established that value. However, sufficient evidence was received at a contested cash collateral hearing to enable the Court's finding on December 5, 2006, that the value of property securing Nelson's pre-petition claim is less than those claims.

### THE NELSON CLAIM

9. On July 31, 2006, Mr. Nelson filed its secured proof of claim in the Debtor's bankruptcy case in an amount in excess of $2,346,072 (the "Nelson Claim"). The Nelson Claim arises from both loans Mr. Nelson made to RTI personally, and from the outstanding balance on a note which Mr. Nelson purchased for face value from West Suburban Bank (the "Bank").

### A. *Loans and Advances by Nelson to RTI*

10. On July 10, 2002, a Special Meeting of Directors was held by conference call, at which time all the directors of the corporation discussed whether RTI should enter into a credit agreement with Mr. Nelson wherein Mr. Nelson would provide financing to RTI. July 10, 2002, RTI Board Meeting Minutes, (the "July 2002 Minutes"). Other issues discussed at that meeting included:

a. Increased compensation to Nelson to pay for his increased day-to-day participation in RTI management;

b. The requirement that Nelson spend at least 50% of his time on RTI business; and

c. Granting of options to Nelson for 1,200,000 more shares of RTI common stock at about $.23 cents per share.

11. Mr. Nelson left the conference call to allow the other directors to discuss and vote on the issues discussed, and, as the prospective lender, Mr. Nelson did not vote on whether or not RTI should borrow the funds, July 2002 Minutes. Thereafter, all remaining directors, including Mr. and Mrs. Emerson, voted in favor of entering into a line of credit to be advanced by Mr. Nelson. July 2002 Minutes.

12. On August 30, 2002, RTI, through its president, Mr. Emerson, executed a Revolving Credit Note (the "Nelson Note") with Mr. Nelson, which granted Debtor a line of credit up to $500,000, at an interest

rate of 15%, with interest only to be paid each month until August 1, 2007, when the entire balance is scheduled to become due.

13. On August 30, 2002, RTI, again through its president, Mr. Emerson, executed a Commercial Revolving Loan And Security Agreement (the "Nelson Security Agreement"), which granted Mr. Nelson "a security interest in *all assets of the Debtor* ... to secure payment to [Mr. Nelson] of the Obligations ..." Nelson Security Agreement, p. 1. *See also,* J. Emerson Dep. Tr. 111:10—113—6. Nelson did not record a UCC–I financing statement perfecting his security interests until October 29, 2004 (more than two years after execution of the Nelson Note and Nelson Security Agreement).

14. In the Nelson Security Agreement, "Obligations" is defined as

[T]he loan and any and all other advances made hereunder, together with interest thereon, and any and all other indebtedness, liabilities and obligations of whatever nature of the Debtor to [Mr. Nelson], no matter how or when arising and whether under this Agreement, the other Loan Documents, or under any other agreements, guarantees, instruments, or documents executed and delivered by Debtor to [Mr. Nelson] past, present, or future, and the amount due on any notes, or other obligations of Debtor given to, received by or held by [Mr. Nelson] ... for or on account of any of the foregoing, whether, in each case, direct or indirect, absolute or contingent, due or to become due, not existing or hereinafter arising.

As of the date of the filing of Debtor's related bankruptcy case, the Nelson Security Agreement is asserted to impose a lien on all of Debtor's assets. Nelson Security Agreement, p. 2–3.

15. At least $500,000 was initially advanced by Mr. Nelson to RTI under the Nelson Note and Nelson Security Agreement (the "Initial Advances").

16. On December 19, 2003, a regular meeting of the Directors of RTI was held at RTI's offices and all Directors of RTI were present. Board of Director Meeting Minutes from December 19, 2003, were submitted without objection (the "December 2003 Minutes").

17. At the December 19th meeting, Michael D. Blair, an RTI Director, moved that the Nelson Line of Credit be increased to $1.5 million. The motion carried by a vote of 3 to 0 with 2 abstentions. December 2003 Minutes. Mrs. Emerson and Mr. Nelson were the two directors that abstained from the vote. Aff. ¶ 7. However, no new loan documents, security agreements or UCC–1 financing statements were subsequently executed in conjunction with this additional loan. Prior to the date of that meeting, Nelson had already advanced $740,000 over and above his actual loan of $500,000. He advanced $480,000 during the year 2004.

18. From July 11, 2002 through May 28, 2004, Mr. Nelson advanced funds to the Debtor, which totaled between $1,740,000 and $1,785,000 (the "Nelson Loans"). However, no lending larger than the $1.5 million authorized by the December 19, 2003 Meeting was ever authorized by the Board.

19. According to the July 2002 Minutes and the December 2003 Minutes, Mr. Nelson refrained from voting on whether a line of credit should be established, and also whether the line of credit should be extended.

20. The Debtor kept an internal record titled "Revolving Credit Statement, William G. Nelson" in which it recorded the Nelson Loans, and also recorded all interest payments made by RTI to Mr. Nelson with respect to those loans (the "Interest

Worksheet"). RTI paid interest on the Nelson Loans through June 2, 2004. Such interest was paid on the entirety of the Nelson Loans outstanding at the time of each payment at the rate of 15% per annum, the rate provided by the Nelson Loan Documents.

21. The Nelson Loans were all listed on RTI's balance sheets as comprising a liability, and as recently as April 30, 2006 were so listed in the amount of $1,785,000. The 2004 Corporate Tax Return prepared and filed on behalf of RTI, by RTI's accountants, Burritt, Carlson, & Associates, reported that the Nelson Advances comprised a liability in the amount of $1,785,000.

22. In a letter to RTI Investors, dated September 29, 2004 (the "September 2004 Letter"), RTI indicated that it had "outstanding loans to [its] bank and to one of [its] Directors. William Nelson. The total amount of these loans is approximately $2 million." September 2004 Letter. Furthermore, in an attachment to a letter to RTI Investors, dated February 27, 2006 (the "February 2006 Letter"), RTI indicated that it had notes payable to its director, Mr. Nelson, in the amount of $1,785,000.[2] February 2006 Letter. From all the foregoing corporate records and documents, it might be found that all advances by Nelson to RTI amounted to a total of $1,785,000. However, in open court on December 28, 2006, counsel for the parties stipulated that the total of Nelson's advances was only $1,740,000.

23. No other documents were ever executed evidencing any purported additional indebtedness of the Debtor to Nelson other than that relating to the $500,000 line of credit from Nelson in August 2002 ("$500,-000 Line of Credit"). However, the Debt-

or's tax returns, internal books and records, letters to shareholders, financial statements and various minutes from meetings of the Board of Directors reflected recognition by RTI's Board and Officers of additional loans from Nelson. See e.g., RTI Revenue Worksheet reporting advances under the Nelson Line of Credit in the amount of $1,785,000; December 2003 Minutes showing approval by RTI's Board of Directors to increase the Nelson line of credit to $1.5 million; Interest Worksheet attached as Ex. N to Nelson's Statement of Uncontested Facts showing a balance on the Nelson line of credit of $1,240,000, as of December 12, 2002; Repository Technology, Inc. Balance Sheet, As of April 30, 2006, attached as Ex. P to Nelson's Statement of Uncontested Facts showing an outstanding liability of $1,785,000 on the "WGN Line of Credit"; September 2004 Letter attached as Ex. Q to Nelson's Statement of Uncontested Facts (indicated that RTI "has outstanding loans to [its] bank and to one of [its] Directors, William Nelson").

24. The only loan document that has a stated maturity date (August 2007), fixed interest rate (15%) or schedule of payments (interest only on a monthly basis) is the $500,000 Line of Credit. Emerson Aff. ¶ 6. However, all of the advances made by Mr. Nelson were made on the same terms as the Nelson Loan Documents. See, e.g. December 2003 Minutes (approval by RTI's Board of Directors to increase the Nelson line of credit to $1.5 million); Interest Worksheet (showing a balance on the Nelson line of credit of $1,240,000, as of December 12, 2002, and showing interest payments on all of the Nelson advances at a rate of 15%); Repository Technology, Inc. Balance Sheet, As of April 30, 2006

2. The February 2005 letter, on its face, indicates that it was written February 27, 2005, but Mr. Emerson testified during his deposition that this was in error, and the correct date was February 27, 2006. J. Emerson Dep. Tr. p. 234:22—235:7.

(showing an outstanding liability of $1,785,000 on the "WGN Line of Credit," and showing no differentiation between advances made by Mr. Nelson).

25. All of the Nelson Loans were treated the same by RTI and its Board and Officers, regardless of whether they were made under the original Nelson Note or otherwise. *Id;* Debtors 2004 Financial Statements. Accordingly, advances over $500,000 and up to a total of $1,500,000 were "advances" and "liabilities" made under terms of the Nelson Security Agreement (Finding No. 14).

26. At a meeting of RTI's Board of Directors, held June 25, 2004, Mr. Nelson indicated that he would not agree to further increase by him of RTI's line of credit. June 25, 2004, Minutes of RTI's Meeting of Directors.

27. At some point during the second half of 2004, Mr. Emerson presented Mr. Nelson with a proposed draft Modification and Forbearance Agreement, prepared at the request of Mr. Emerson by RTI's attorneys (the "Draft Modification Agreement"). The Draft Modification Agreement indicated that: "[Mr. Nelson] has made available to [RTI] a line of credit in the maximum principal amount of $1,785,000 (the 'Loan') secured by a lien on all of [RTI's] tangible and intangible business assets" and further indicates that "the current outstanding principal balance under the loan is $1,785,000, as evidenced in part by a Revolving Credit Note from [Mr. Nelson] to [RTI] dated August 30, 2002 in the amount of $500,000 and as otherwise evidenced and recorded on the books and records of the Borrower." Mr. Emerson did not dispute those proposed representations, but he did not agree to the proposed terms of the suggested modifications, so the Agreement was not signed.

28. At the time of each advance by Nelson to the Debtor, Nelson was a director and shareholder of the Debtor and, for a period, was the Debtor's salaried Chief Executive Officer and Nelson became a salaried Chief Executive Officer at the time that his $500,000 Line of Credit was approved by the Debtor's Board of Directors.

29. Nelson funded $155,000 of his initial $500,000 Line of Credit before the loan documents were signed in August 2002, Debtor's Loan Worksheet attached to Memo. as Ex. G; Emerson Aff. ¶ 13, but that funding was made the day after the credit line was approved by the Board of Directors. Minutes of Board Meeting July 2002.

30. By the time Debtor's Board of Directors authorized an increase in the $500,000 Line of Credit from $500,000 to $1,500,000 on December 19, 2003, Nelson already advanced a total of $1,240,000 of the newly authorized amount of $1,500,000. Emerson Aff. ¶ 14.

31. The Debtor's Board of Directors never authorized any increase of the $500,000 Line of Credit from $1,500,000 to the $1,785,000 that Nelson asserts he loaned to the Debtor (stipulated by his counsel to total $1,740,000). Nelson gave money to Debtor as more cash was needed, which was determined by request to Nelson or his representative, to pay bills and payroll that could not otherwise be paid.

32. Nelson advised Debtor on occasion that he did not expect to be paid on his debt until Debtor "was no longer in trouble," that the funds advanced by him were not that significant to him; and that if needed he could simply take the loss emanating from not being repaid. Memo. dated August 16, 2004 from Michael P. Brosnahan, Senior Vice President at the Bank. Therefore, RTI made no payments on the

Nelson advances from June 2, 2004, to April, 2006. However, Nelson never waived his ultimate right and intent to collect his advances to RTI when business of RTI improved.

33. No sinking fund was ever required or established for the repayment of any advances made by Nelson to Debtor. Nelson delayed perfecting his security interests in Debtor's property until October 29, 2004—almost twenty-eight months after the making of the original $500,000 Line of Credit to the Debtor.

34. Debtor's records indicated that it had a small deficit net worth during the period 2000 through 2004 that began at $20,825 in 2000 and grew thereafter. Debtor's Revenue Worksheet attached to Memo. as Ex. D; Emerson Aff. ¶ 9; Aff. of Brosnahan ("Brosnahan Aff.") ¶ 3 attached to Memo. as Ex. E.

35. Debtor argues that it was undercapitalized when the Nelson loans and advances were made. However,

a. The Debtor's total accounts payable at all times mentioned here were $60,000 or less and only $2,282, as of April 30, 2006; and the Debtor, at all times mentioned, met and currently has the ability to meet its service and maintenance obligations to its customers (i.e., "unearned maintenance"); and

b. The Debtor during all periods when Nelson was advancing money was able to pay currently during these periods its obligations to the Bank and it did so.

## B. *The Bank Note*

36. On or about October 1, 2004, RTI executed a Promissory Note in favor of West Suburban Bank ("Bank") in the amount of $202,461 ("Bank Note").

37. On or about October 1, 2004, the Debtor also executed a Commercial Security Agreement, granting the Bank a lien against "[a]ll Inventory, Chattel Paper, Accounts. Equipment and General Intangibles" of the Debtor (the "Bank Security Agreement"), which lien was properly perfected.

38. RTI stayed current on its obligations with respect to the Bank Note from October, 2004 through the filing of its bankruptcy petition on April 25, 2006 (the "Petition Date"). At all times that the Nelson Debt and Loans were outstanding, the Debtor had financing from the Bank.

39. In March of 2006, Nelson, while still serving as a director of RTI, contacted the Bank to inquire about acquiring the Bank Note for himself. Mr. Nelson then purchased the Bank's interests in the Bank Note and the West Suburban Security Agreement for the face value of the outstanding principal due and owing under those obligations—which amounted to $126,484.01. On or about April 10, 2006, the Bank assigned its interest in the Bank Note and the West Suburban Security Agreement to Mr. Nelson.

40. Mr. Nelson did not receive any special benefit due to his status or affiliation with RTI during the process of acquiring the Bank Loan.

41. As of the Bankruptcy filing date, Nelson, as successor to the Bank, held a valid secured claim in the amount of $126,484.01 plus any accrued interest and possible attorneys' fees and costs if claimed for amounts due under the Bank Note and secured by the properly perfected lien created by the West Suburban Security Agreement.

42. The Debtor's only indebtedness due to an outside financial institution during periods when Nelson made his advances was on the Bank Loan. Nelson did

not guarantee the Bank Loan. The original Bank Loan was in the form of a line of credit that pre-dated all of Nelson's advances and was renewed in lesser amounts while Nelson's loans and advances were outstanding. The West Suburban Bank Loan Summary provided a summary of loans made by West Suburban Bank (the "WSB Loan Summary"), and that includes thirteen separate "line of credit" entries, each with distinct and varied origination dates ranging from May 8, 1995, through July 1, 2004, and each with distinct and varied maturity dates. WSB Loan Summary. Further, the WSB Loan Summary includes a Term Loan made to Debtor by the Bank with an origination date of October 1, 2004. WSB Loan Summary. The Bank was unwilling after that date to make any additional or larger loans to the Debtor due to Debtor's financial condition.

43. On September 1, 2002, RTI, the Bank, and Nelson executed a Subordination Agreement which completely subordinated each loan and advance from Nelson to RTI to the interests of the Bank. It barred Nelson from forcing collection or enforcing his security position without the Bank's consent. At the time of this subordination, the Bank was Debtor's major, non-contingent creditor. However, the Subordination Agreement did permit RTI to pay interest payments on the Nelson debt so long as it was not in default on the Bank Loan, and also permitted the Bank to assign the loan to anyone at any time without notice to RTI.

44. In late March 2006 or early April 2006, Nelson contacted the Bank to inquire about acquiring the Bank Loan for himself. Unbeknownst to Debtor and its Board of Directors, Nelson then purchased the Bank Loan on or about April 4, 2006, while he was still a director of the Debtor, by paying off in full the Bank Loan balance then due from his own personal funds.

45. On April 10, 2006, while still serving as a director of the Debtor, Nelson obtained an assignment of the Bank's UCC-1 financing statements from the Bank. On April 12, 2006, Nelson received the Bank's Note (with the noted assignment thereof) and Security Agreement relating to it.

46. At the time Nelson acquired the Bank Loan, Debtor was current on its payments to the Bank, and had the ability to continue to pay on such loan. If necessary, it could have paid off the loan balance.

47. The effect of Nelson's acquisition of the Bank Loan at a time when the Debtor was current on such loan, was to increase Nelson's claims against Debtor by the amount of the Bank Loan, to elevate Nelson into the position as the only secured creditor of Debtor.

48. At no point prior to April 11, 2006, did Nelson ever inform Debtor, its Board of Directors or its officers that he had acquired the Bank Loan by paying off the Bank Loan with his personal funds or that he had obtained an assignment of the Bank Loan and Bank liens on Debtor's assets emanating therefrom.

### NELSON'S RESIGNATION AND DELIVERY OF DEFAULT NOTICE

49. On April 11, 2006, Mr. Nelson delivered to Mr. Emerson a resignation of Nelson's position as a director of RTI. Resignation; *See also*, Aff. ¶ 15. Also on April 11, 2006, but subsequent to delivery of the Resignation, Mr. Nelson delivered to Mr. Emerson a Notice of Default (the "Default Notice").

50. The Default Notice asserted Nelson's secured claim and informed RTI that it had failed to make approximately $509,687 in scheduled interest payments

on the loans by Nelson since June 2004. It further noted that neither the terms of the Nelson Line of Credit nor the Nelson Security Agreement required Nelson to notify RTI that it was in default with respect to the agreements. Other than informing RTI of the default, the Default Notice did not contain any other statements regarding Mr. Nelson's future intentions.

51. The Default Notice did not contain any specific threats regarding enforcement of the terms of the Nelson Line of Credit or the Nelson Security Agreement through litigation or other enforcement action, but did demand that the Nelson Loans be made current within 15 days or else Mr. Nelson would thereafter consider a default to have occurred under terms of the documents. That statement was certainly an implied contention that after the deadline Mr. Nelson would have all rights to redress held by him as a secured creditor following default.

52. After tendering his resignation and the Default Notice, Mr. Nelson did not seize or take further steps in an attempt to seize the assets of RTI, nor did he file foreclosure proceedings, nor did he take any other overt action to collect the amounts due under the Nelson Loans. But expecting the worst, and because RTI did not have financial ability to bring the Nelson Loan current within 15 days, it filed its related bankruptcy case to obtain protection from any possible action by Nelson.

53. At no time did Mr. Nelson actually form a new corporation to accept, hold, or manage the assets or business of RTI. However, he consulted his counsel about the possibility of doing so and may have instructed them to begin forming a new company which would include the name RTI. He also contemplated replacing RTI management and putting its assets into a new company under new management.

54. Upon receipt of the Notice of Default, Debtor requested that Nelson extend the deadline for curing the default asserted by Nelson. Nelson's response to that request was that unless Debtor agreed to turn over its assets to a new entity to be formed and controlled by Nelson, Nelson would not agree to extend the deadline set in the Notice.

55. Mr. Nelson's allegedly "inequitable" actions complained of here, included: (a) Mr. Nelson's acquisition of the Bank Loan while serving as a director of RTI; (b) Mr. Nelson's service of the Default Notice on RTI on the same day that he resigned from the Board; and (c) Mr. Nelson's preliminary planning to consider forming a new corporation for the purpose of holding and employing RTI's assets, all considered while he was a member of the Board. None of those steps have yet caused any harm to the Debtor or its creditors or its business, other than the cost of efforts taken here to oppose the Nelson efforts to exercise his loan rights to collect his debt and take over the RTI assets that comprise security. The creditors continue to deal with the Debtor and the company remains a viable and stable business.

### THE BANKRUPTCY FILING

56. RTI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 25, 2006 ("Chapter 11 Case"). As of the Petition Date, RTI was substantially current on all of its debt. As of the Petition Date, the Debtor had only two or three trade creditors with a combined indebtedness of approximately $2,300. J. Emerson Dep. Tr. p. 204:23—205:15. In addition the Debtor was indebted to a former landlord in the approximate amount of $30,000. Mot. to Dismiss

Resp. p. 7. The remainder of the approximately $400,000 in scheduled unsecured claims relates to claims for "unearned maintenance" attributable to the unfulfilled remaining life on multiple contracts that RTI has with its customers.

### STATUS OF RTI BUSINESS

57. Debtor, its creditors and its shareholders have not been injured by Nelson's implied threat to foreclose on business assets, but the positions of all stockholders other than Nelson have been jeopardized by Nelson's demand to Debtor for payment.

58. Debtor's customers who constitute the majority of Debtor's creditors have not indicated any uncertainty thus far about continuing to deal with Debtor so long as Emerson heads the company.

59. Debtor has incurred fees and costs attributable to the related bankruptcy case and to prosecuting the allegations of this Adversary Complaint, but no economic harm to Debtor has yet been demonstrated. Indeed, during the many months in which Nelson did not demand payment, Debtor turned profitable, and remains profitable. Debtor used that period to reduce its expenses.

60. Debtor has eliminated its Boston office and significantly reduced its staff of employees from seventeen (17) to six (6). Other overhead costs have also been trimmed.

### FURTHER FACTS

61. Further facts discussed in the Conclusions of Law will stand as additional Findings of Fact.

### JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). Venue for this matter is proper pursuant to 28 U.S.C. § 1409(a). This Adversary Proceeding and causes of action herein constitute "core" proceedings within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).

### CONCLUSIONS OF LAW

**A. NELSON'S CLAIMS WILL BE RE-CHARACTERIZED TO EQUITY ONLY AS TO ADVANCES EXCEEDING $1,500,000**

■ Recharacterization is a separate and distinct cause of action from equitable subordination even though the doctrines may have similar impacts on a party's indebtedness. *In re Lifschultz Fast Freight*, 132 F.3d 339, 345 n. 3 (7th Cir. 1997); *In re Kids Creek Partners, L.P.*, 212 B.R. 898, 931–32 (Bankr.N.D.Ill.1997). Recharacterization involves a factual determination as to whether the asserted debt is in fact debt or is really an equity contribution disguised as debt. Recharacterization is within the broad powers afforded a bankruptcy court under § 105 of the Bankruptcy Code and facilitates the priority scheme of claims and interests established under the Bankruptcy Code. *In re Official Committee of Unsecured Creditors for Dornier Aviation*, 453 F.3d 225, 231 (4th Cir.2006); *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr.N.D.Fla. 1990).

■ In determining the true character of a transaction, many factors have in different cases been deemed relevant:

 a. the names given to the instruments, if any, evidencing the indebtedness;

 b. the presence or absence of a fixed maturity date and schedule of payments;

 c. the presence or absence of a fixed rate of interest and interest payments;

 d. the source of repayments;

e. the adequacy or inadequacy of capitalization;

f. the identify of interest between the creditor and the stockholder;

g. the security, if any, for the advances;

h. the corporation's ability to obtain financing from outside lending institutions;

i. the extent to which the advances were subordinated to the claims of outside creditors;

j. the extent to which the advances were used to acquire capital assets; and

k. the presence or absence of a sinking fund to provide repayments.

*In re Outboard Marine Corp.,* No. 02 C 1594, 2003 WL 21697357, at *5 (N.D.Ill. July 22, 2003); *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749–50 (6th Cir.2001); *Roth Steel Tube Co. v. C.I.R.,* 800 F.2d 625, 630 (6th Cir.1986).

Some courts have added the following factors to be considered in a recharacterization action:

a. The ratio of shareholder loans to capital; and

b. The amount or degree of shareholder control.

*In re Outboard Marine Corp.,* No. 02 C 1594, 2003 WL 21697357, at *5 (N.D.Ill. July 22, 2003); *In re Hyperion Enterprises,* 158 B.R. 555, 561 (D.R.I.1993). No single factor is determinative of the outcome, and the weight to be given to each must be based on an analysis of the particular circumstances presented. The more the transaction appears to be an ordinary commercial arms length deal, the more likely the transaction is a loan as opposed to an equity contribution. *AutoStyle,* 269 F.3d at 749.

Nelson advanced a total of $1,740,000 to Debtor over two years to fund a new RTI marketing program and also to sustain a healthy cash flow for its ordinary business activities.

Nelson was an "insider" within the meaning of § 101(31)(B) of the Bankruptcy Code and other applicable case law since Nelson had a sufficiently close relationship with Debtor that his conduct is subject to closer scrutiny than those dealing at arm's length with the Debtor. *In re Krehl,* 86 F.3d 737, 741 (7th Cir.1996). A fiduciary (which Nelson was) is subject to even stricter scrutiny than insiders. *In re Daugherty Coal Co. Inc.,* 144 B.R. 320, 324 (N.D.W.Va.1992).

Debtor's position in support of recharacterization of the debt due and owing to Mr. Nelson to equity, as set forth in RTI's Argument, can be summarized as follows:

a. The secured note issued by Debtor was not amended from the original $500,000 to the $1,740,000 total ultimately advanced;

b. Mr. Nelson advanced monies before RTI's Board of Directors authorized some of the borrowings;

c. Mr. Nelson did not perfect his security interests until after he started to advance the monies;

d. Mr. Nelson, subsequent to making the advances, agreed to forbear in receiving payments until RTI was successful;

e. The sales and marketing program attempted by RTI was not successful;

f. Mr. Nelson received a salary and an option to acquire $1,200,000 shares of RTI's common stock during the period he was advancing money; and

g. RTI was undercapitalized.

While the promissory note was not amended to include formally all of the advances up to $1,500,000, every other con-

temporaneous writing, book, record, financial statement and tax return recognized the $1,500,000 advanced by Mr. Nelson as debt, and RTI paid interest at 15% per year on the entire amount. RTI's board approved $1,500,000 of the loans formally at Board meetings so established in approved Board minutes, but the remaining $240,000 of loans were never approved by the Board. Moreover, the original Security Agreement allowed future advances to become covered by the Nelson Security Agreement (See Finding No. 14).

■ The evidence is overwhelming that from the beginning and at all times thereafter both parties viewed Mr. Nelson's advances up to $1,500,000 as debt. The timing of the advances, the subsequent perfection of Mr. Nelson's security interest, and timing of Board approval of advances are irrelevant because the advances were undeniably made and authorized or ratified by the Board and the lien created thereby undeniably granted and later perfected. The date of perfection is of little economic relevance in a case where the claims of Nelson and other creditors are not affected by the timing of perfection.

■ Nelson's advances up to $1,500,000 were approved, documented adequately, repeatedly acknowledged by RTI, and serviced by interest payments at the agreed rate. When Nelson made advances above that level that were not Board approved or documented, he did so to keep RTI afloat to protect his interests in ultimately recovering on his earlier advances, the motive of an investor. Had he deemed those advances to be further loans he would have insisted on further Board approval or other documentation. Had the RTI Board considered the extra advances to be loans, it would have approved them. Because Nelson did not obtain Board approval or

other documentation, the $240,000 was his investment rather than RTI's debt.

In June 2004, Nelson explicitly refused to make further advances, and in October 2004, the Bank refused new loans and converted all existing debt to a fixed obligation. In 2004, therefore, both Nelson and the Bank considered RTI a financial risk more so than in prior years.

Therefore, Nelson's advances over $1,500,000 will be considered investments, while those up to that limit were proper loans that RTI cannot now repudiate through recharacterization.

■ That Mr. Nelson subsequently agreed to forbear in receiving payments until RTI was profitable is not significant in the recharacterization analysis. Debtor argues that Mr. Nelson's statements that he would forbear on collecting the amounts due to him until the company became successful support the conversion of the loans to equity contributions. RTI Argument, p. 20. However, according to Mr. Emerson, the first time that Mr. Nelson told RTI that he would hold off on collecting on his loans was in June 2004, well after all of the advances had been made documented, and acknowledged. Trial Tr., 69:12—70:8; Aug. 29, 2006; Nelson's Ex. 33. Only if Nelson had later unequivocally waived and renounced his existing claims could Plaintiff's contentions hold water. However, the forbearance conversations merely agreed to defer collection, and cannot be found to have forever waived Nelson's claims.

RTI in fact became more successful, and thus if there were any condition for ending the forbearance it was met. See Nelson's 7056–2 Statement, ¶ 46. By Debtor's own admission of its success, RTI could and therefore should have started to make payments on Mr. Nelson's loans by the end of 2005.

Debtor's argument seems to be that a creditor's agreement to forbear until Debtor is in position to pay will result in recharacterization of secured or unsecured debt to equity. It can hardly be argued that forbearance in the face of financial stress by itself supports a finding of recharacterization. Forbearance until a debtor's cash flow improves may be good judgment to keep a loan out of bankruptcy court, and that is all to be concluded from Nelson's forbearance for a time in connection with RTI's debt. Moreover, forbearance came after all the loans were made under commercially common terms and documentation. If such forbearance could retroactively convert a good loan to equity, that would indeed validate the saying that "no good deed goes unpunished."

RTI's sales and marketing program that was funded by Nelson's loan was adopted by its Board of Directors for the benefit of all shareholders. This business decision was entirely within the business judgment of RTI's Board of Directors. It has not been established that RTI's ultimate obligation to repay Mr. Nelson was in any way tied to the success of the sales and marketing program. In addition, given that the loans were each approved by an independent Board with absolutely no evidence of undue influence or coercion, it is clear that Mr. Nelson's loans were the product of arms length negotiations. Trial Tr., 101:23—105:8, Aug. 29, 2006. The loan terms themselves were not shown to be unusual or different from ordinary commercial loans.

Mr. Nelson advanced a great deal of money to fund normal expenses and also to fund a new sales and marketing program, a contribution not undertaken or funded by any other shareholder. In return he received a Note and security interest, and promise of interest. Mr. Nelson also received a $60,000 annual salary and an option to purchase 1,200,000 shares at $0.23/share in exchange for his loans to RTI. He was then a 8.86% shareholder and all the noncontributing shareholders held 91.14% of RTI's stock.

Had Mr. Nelson exercised his option, at a cost of $276,000 he would have increased his ownership percentage of RTI from 8.86% to 18.6% and the total number of shares outstanding would have increased from 10,059,628 to 11, 259,628. If it be assumed *arguendo* that RTI's purported going concern value is the unproven $3,500,000 suggested by Mr. Emerson, the equity value of RTI, rehabilitated and improved as the Debtor suggests, would be $.08 per common share, or less than one-third of the option price. The option granted to Mr. Nelson was therefore of minimal value if considered as an equity investment. His lending makes economic sense only if viewed as a loan to a stable company with a hopeful future.

Debtor seems to rely on an assumption of economic irrationality, that the holder of 8.86% of the stock (and 8.86% of possible future profit) would put up 100% of the new money to fund the business and receive very little in return. In most reported cases where recharacterization was ordered, the holder of the claim held most or all of the stock in the debtor, and was therefore entitled to all future profits generated by the investment. In this case, apart from being contradicted by weight of the evidence, the assumption that the parties intended Mr. Nelson's first $1.5 million of advances to be capital contributions makes no economic sense. The Debtor claims that Mr. Nelson was "... assuming the risk of an investor making capital contributions." RTI's Argument, p. 21. It cannot be assumed that Mr. Nelson did or would assume such risk in exchange for little possible investment return as a stockholder or prospects of such return.

RTI next argues that it was undercapitalized at the time that Mr. Nelson made its loans. Whether a debtor was adequately capitalized can be relevant to both issues of equitable subordination and recharacterization. Undercapitalization is a relevant factor in the equitable subordination analysis as a factor in determining whether the corporate operations were or not a danger to trade customers who advance credit. Whether undercapitalization existed is to be proven by the testimony of a skilled financial analyst. *See, e.g., In re Lifschultz Fast Freight*, 132 F.3d 339, 351 (7th Cir.1997) ("Undercapitalization exists at inception 'if, in the opinion of a skilled financial analyst, [the capitalization] would definitely be insufficient to support a business of the size and nature of the [debtor] in light of the circumstances existing at the time the bankrupt was capitalized.' ").

In this case, Debtor argues that the parties intended Nelson's advances to be treated as capital contributions because the company is said to have been undercapitalized. However, the evidence contradicts that contention:

a. With $800,000 in opening capital to support a business with less than $2,000,000 per year in revenue and no need of any significant trade credit, such capitalization was more than adequate at the inception of the business. This conclusion is supported by testimony of the only skilled financial analyst to testify. Trial Tr., 31:22—32:11, Oct. 24, 2006.

b. Both at the time Mr. Nelson made his advances and today the Debtor has been, and is, able to meet all of its obligations and is, according to the Debtor, making money. Trial Tr., 34:23—35:11, Oct. 24, 2006. Thus, Mr. Kayman's expert opinion that RTI is and was adequately capitalized is buttressed by actual performance, not merely by projection or conjecture.

c. The documentary and testimonial record of the parties' intent is entirely one sided and clear in favor of the conclusion that Mr. Nelson's advances were intended by the parties to be debt. As earlier discussed, it has not been established that Mr. Nelson's advances were intended by the parties to be capital contributions.

Mr. Emerson, in his rebuttal testimony, tried to suggest that RTI was not adequately capitalized in 2001 because it had "used up" its original $800,000 in capital. The Debtor urges adoption of a rule that a corporation which "used up" its capital or which has negative shareholder's equity may not borrow money without putting the lender at risk that its debt claim will be recharacterized as equity, and that this be so regardless of whether that corporation thereafter is able to generally pay its debts when due. Only one skilled financial analyst testified on the issue of whether RTI was undercapitalized at pertinent times and to an extent that suggests that loans were intended as investments. Mr. Kayman, a witness for Nelson, testified as such. His opinion supports the conclusion that RTI was not at any time undercapitalized.

Despite the Debtor's claim that "... no other third party lender would have been willing to extend credit to the Debtor;" RTI's Argument, pp. 12, 22, that was certainly not true during the period of Nelson's advances. Mr. Emerson testified that he never sought financing from any sources other than the Bank. Trial Tr., 126:5–17, Aug. 29, 2006. Further, the line of credit that Debtor had with the Bank remained open (despite the fact that according to its own terms it was callable at any time) until October 2004 when it was

converted to a term loan. Trial Tr., 76:15–19, Aug. 29, 2006.

Moreover, all of the Nelson loans up to $1,500,000 were pre–2004. It was not until 2004 that both Nelson and the Bank indicated doubts about the financial risk of new lending.

Finally, RTI's argument refers to two additional factors to be considered: the amount or degree of shareholder control; and the ratio of shareholder loans to capital. RTI's Argument, p. 17.

First, Mr. Nelson was not a controlling shareholder of the Debtor. He held 8.86%, while the Emersons held 66.84%. Further, RTI's Board of Directors was composed of the Emersons, Mr. Nelson, and other shareholders unrelated to Mr. Nelson. At no time did Mr. Nelson have more than one vote out of five and he did not vote on any matter involving the loans he made to RTI. Finally, there is no expert evidence in the record as to what constitutes an appropriate ratio of shareholder loans to capital.

## B. NELSON'S CLAIMS SHOULD NOT BE EQUITABLY SUBORDINATED; HIS LIENS SHOULD NOT BE TRANSFERRED TO THE ESTATE; AND HE DID NOT BREACH FIDUCIARY DUTIES

### 1. Section 510(c)(2)

Debtor argues that to any extent Nelson retains claims they should also be equitably subordinated to all other claims against the Debtor under § 510(c)(1) of the Bankruptcy Code. It further argues that liens of Nelson against property of the Debtor should also be transferred to Debtor's estate under § 510(c)(2) of the Bankruptcy Code which provides:

(c) Notwithstanding subsection (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim or all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

The standards and precedents including the leading Seventh Circuit opinion defining standards applicable to establish subordination were recently summarized by the District Judge in *In re Kreisler*, 352 B.R. 671 (N.D.Ill.2006):

> Whether a claim should be equitably subordinated must be met on a case by case basis. *Daley v. Chang*, 286 B.R. 54, 83 (Bankr.N.D.Ill.2002). The doctrine of equitable subordination should be invoked only in extreme circumstances and only where a clear inequity has been wrought ... *Aetna Bank v. Dvorak*, 176 B.R. 160, 166 (N.D.Ill.1994). It is a remedial rather than penal doctrine, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered as a result of the inequitable conduct. *Braas Sys., Inc. v. WMR Partners*, 157 B.R. 852, 857 (N.D.Ill.1993).

*Kreisler*, 352 B.R. 671, 675–76 (N.D.Ill. 2006):

■ It was further noted:

[W]hether a creditor's conduct is deemed inequitable under § 510(c) depends on the relationship between the creditor and the debtor. *Braas*, 157 B.R. at 858. Dealings of an insider or fiduciary of the debtor are subject to a higher level of scrutiny than dealings of a non-insider third party. *Herzog v. Leighton Holdings, Ltd.*, 212 B.R. 898, 928 (Bankr.N.D.Ill.1997), *aff'd* 239 B.R. 497, 504–05 (N.D.Ill.1999). If the claimant is an insider, the proponent of equitable subordination has the initial bur-

den of presenting evidence of unfair conduct by a preponderance of the evidence. *Herzog*, 239 B.R. at 504–05. If the proponent meets that standard then the burden shifts to the claimant to demonstrate good faith and fair conduct. *Id.*

The term "insider" is defined in the bankruptcy code. If, as in the instant case, the debtor is an individual, insider is defined in 11 U.S.C. § 101(31)(A) as including a:

(i) relation of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation in which the debtor is a director, officer or person in control.

This definition is intended to be illustrative rather than exhaustive, and the term also encompasses anyone with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing arms-length with the debtor." *In re Krehl*, 86 F.3d 737, 741 (7th Cir.1996).

*Kreisler*, 352 B.R. at 676.

█ Nelson has been found to be a fiduciary and insider. Having determined Nelson's status, the key issue is whether his conduct was complained of was "inequitable" or conferred an "unfair advantage" on him. Under the summary of applicable precedent surveyed in *Kreisler*, because of his insider and fiduciary status, Nelson's activities are

... subject to a higher level of scrutiny. *Herzog*, 212 B.R. at 928. According to *Lifschultz*, the type of conduct considered inequitable generally falls within three categories: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of a debtor as a mere instrumentality or al-

ter ego. *Lifschultz*, 132 F.3d at 344–45. Subordination should be proportionate to the claimant's wrongdoing. "Cases subordinating the claims of creditors that dealt at arms-length with the debtor are few and far between." *Kham & Nate's Shoes No. 2. Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990).

While equitable subordination must "be proportionate" to any wrong that it seeks to remedy, in this case no wrong at all has been established through proof that Nelson loaned Debtor a great deal of money that it needed and took assignment of the Bank Loan that RTI agreed could be freely assigned by the Bank to anyone.

█ Nelson's involvement in RTI actually benefitted the business. Indeed, the money loaned in relation to the Nelson Line of Credit is one of the primary reasons why Debtor has been able to stay in business as long as it has. In essence, Debtor is trying here to characterize the cash flow on which it heavily relied as a great wrong against it. Therefore, the attempt to equitably subordinate the $1,500,000 in Nelson loans and interest thereon has no credible traction when that attempt is based on the lending history. Nor is it credible when based on acquisition of the Bank Loan which came long after the $1,500,000 in advances by Nelson. It would seem more than disproportionate to subordinate the lending which was completed before 2004 because of actions that took place two years later in 2006.

What the Plaintiff actually seeks is to subordinate to control of RTI and its majority stockholders the rights acquired by Nelson to demand payment of his $1,500,000 personal debt because be acquired the Bank Loan and thereby swept aside the contractual restraint imposed by the Bank on his right to force collection of the debt due to him. RTI also seeks to

subordinate Nelson's collection rights to the Bank Loan he paid off and thereby checkmate Nelson's rights to collect at all either on the Bank Loan assigned to him, or on his $1,500,000 in loans.

Plaintiff would have had to prove a terrible wrong by Nelson to justify such relief to oust Nelson from his rights to collect debts due him which, with interest, are close to $2 million. No such wrong was established.

■ In the Seventh Circuit, a bankruptcy court must find three conditions before it may equitably subordinate a claim: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must result in injury to the creditors of the bankrupt or confer an unfair advantage on the claimant; and (3) equitable subordination must not be inconsistent with the provisions of the bankruptcy code. *In re Lifschultz Fast Freight,* 132 F.3d 339, 344 (7th Cir.1997) (citing *In re Mobile Steel Co.,* 563 F.2d 692, 701 (5th Cir.1977)). Plaintiff's failure to establish these three conditions will be explained in detail below.

### 2. *Mr. Nelson Did Not Engage In Inequitable Conduct*

The following types of conduct are considered "inequitable" in an equitable subordination context: (1) fraud, illegality or breach of fiduciary duty; (2) undercapitalization; or (3) the claimant's use of the debtor as an alter ego. *In re Lifschultz Fast Freight,* 132 F.3d 339, 345 (7th Cir. 1997). In Count II and Count III of the Complaint, Debtor alleged that it is entitled to equitably subordinate the Nelson Claim to all other claims and any interests held by Nelson to all other interests because Mr. Nelson allegedly engaged in "gross inequitable conduct."

■ For a court to equitably subordinate an inside creditor's claim, "the creditor-insider must actually use its power or control to its own advantage or to other creditors' detriment." *In re Mr. R's Prepared Foods, Inc.,* 251 B.R. 24, 29 (Bankr. D.Conn.2000) (citing *In re Fabricators, Inc.,* 926 F.2d 1458, 1467 (5th Cir.1991)). Such did not happen in this case.

First, Mr. Nelson's acquisition of the Bank Loan was not "inequitable" in any way. The case law is clear that acquiring a bank loan for par while serving on a board of directors is not a breach of fiduciary duty and does not justify equitable subordination, even if that purchase is done in part to solidify that purchaser's own position. *In re ASI Reactivation, Inc.,* 934 F.2d 1315, 1321 (4th Cir.1991) (where individual used his own funds to buy bank note, no evidence was presented that purchase was fraudulent or injurious to debtor, even when purchaser purchased the debt in part to solidify his position); *Mr. R's Prepared Foods, Inc.,* 251 B.R. at 30 (the insiders' purchase of the bank note and receipt of the bank's security interest left the debtor's other creditors in the same positions they would have been in had the bank collected the indebtedness, and neither conferred an unfair advantage on the insider, nor inflicted any harm upon other creditors); *Agincourt, L.L.C., et al. v. Stewart, et al. (In re Lake Country Investments),* Nos. 99–20287, 00–6064, 2001 WL 267475, at *12 (Bankr.D.Idaho March 19, 2001) (holding that an insider's acquisition of secured debt, without injury to the debtor or unfair advantage, does not justify equitable subordination). Furthermore, the parties have stipulated that Mr. Nelson received no special benefit due to his status or affiliation with RTI during the process of acquiring the Bank Loan. Debtor's 7056–2 Resp. ¶ 47.

Moreover, the Subordination Agreement between RTI, Nelson, and the Bank made clear that the Bank could assign the debt

to anyone it chose at any time without notice. From the origin of the Bank Loan, Nelson, other directors, and anyone else was free to buy the Bank's position without Notice to RTI or any other directors. Nelson acted in 2006 to do something that RTI had contractually consented to long before. As with the case of the $1,500,000 in lending by Nelson, RTI has not shown that it can characterize as inequitable that which it contractually agreed to.

 Second, Mr. Nelson's delivery of the Default Notice to RTI the same day he resigned as Director was not a breach of his fiduciary duty to the corporation or its creditors. That is, it is not a breach of a director's fiduciary duty to lend money to a corporation, nor is it a breach of fiduciary duty to attempt to collect on a lien or debt once loaned even if the lender is a majority stockholder. *In re Charles Crook Wholesale Produce,* 7 F.3d 222 (4th Cir. 1993) ("There is no prohibition against a dominant shareholder's lending money to a corporation."); *In re Brunner Air Compressor Corp.,* 287 F.Supp. 256, 264 (N.D.N.Y.1968) ("There is nothing illegal in an officer or director lending money to his corporation provided he does not use his corporate position to defraud creditors or take unfair advantage of them."); *Marciano v. Nakash,* 535 A.2d 400, 405 (Del. 1987) (directors who advance funds to a corporation with a bona fide intention of assisting the business' efforts to remain in business do not forfeit their claims as creditors merely because of the relationship); *Lifschultz Fast Freight,* 132 F.3d 339, 347 (7th Cir.1997) ("Assuming there was no deception, we see no reason to treat an insider's loan to a company more poorly than that of a third party's. To hold otherwise would 'discourage those most interested in a corporation from attempting to salvage it through an infusion of capital.' "); *In re ASI Reactivation, Inc.,* 934 F.2d 1315, 1321 (4th Cir.1991) (finding that once an insider has made a loan to an entity, it is not per se inequitable for an insider to assert his rights as a lien holder). In this case, there is no evidence that Mr. Nelson attempted to defraud creditors or improperly utilize his position on the RTI Board.

In sum, the evidence did not indicate that Mr. Nelson received any special benefits from his insider status that increased the value of the Nelson Claim or acted to the detriment of the other creditors of the Debtor. Moreover, Mr. Nelson took no action that could not otherwise be taken by a non-insider creditor or by other officers, directors, and stockholders.

Consequently, Debtor has not established any inequitable conduct that would justify the subordination of the Nelson Claims or any interests held by Mr. Nelson. Debtor has therefore failed to establish the first element of equitable subordination—inequitable conduct.

### 3. *The Debtor And Its Creditors Have Not Been Injured By Mr. Nelson*

 To prevail on any equitable subordination claim, the proponent must show that the alleged misconduct resulted in injury to the debtor or its creditors or conferred an unfair advantage on the claimant. *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977). Indeed, a claim or claims should only be subordinated to the extent necessary to offset the harms suffered by Debtor and the creditors as a result of the inequitable conduct. *Id.* at 701.

Here, the alleged injuries which Debtor asserts occurred as a result of Mr. Nelson's alleged inequitable conduct include the following:

a. RTI was forced to defend itself against Nelson's actions to take over its assets and business;

b. RTI is facing paying Nelson for amounts that Nelson deferred collecting until the company became stable; and

c. RTI has incurred significant fees and costs in this litigation attributable to Mr. Nelson's supposed inequitable conduct.

As a starting point, the Debtor has offered no evidence or testimony as to what the concrete amount of these damages might be, or how the Court should evaluate the harms supposedly suffered by the Debtor in a tangible way. But more to the point, Plaintiff did not establish that any "inequitable" conduct by Nelson caused "harm" to RTI or its creditors.

With the exception of the attorneys' fees expended during this case, the Debtor has not shown that monetary damages resulted from the purported inequitable conduct of Mr. Nelson. However, Debtor cannot create the very harm for which it is seeking redress through the litigation itself. In order for a cause of action to exist, the harm must have already existed when the Complaint was filed. Here, according to Debtor's own admission and the evidence of a continuous viable business prior to filing and service of the Complaint, there has been no harm to RTI or to its creditors.

Mr. Emerson even testified that the creditors were not harmed by Mr. Nelson's conduct. When he was asked to explain how Mr. Nelson's inequitable conduct has harmed a creditor of RTI, Mr. Emerson responded: "No. I do not believe that creditors have been harmed because we filed our chapter 11 case—we filed for Chapter 11 protection and prevented Mr. Nelson from taking the actions that he had contemplated." Trial Tr., 126–18–127:9, Aug. 29, 2006.

Debtor actually anticipates harm to other directors, officers, and shareholders who apprehend ouster from their corporate control and offices, a "harm" that the doctrine of equitable subordination is not designed to prevent.

4. *Further Arguments Of The Plaintiff*

Plaintiff argues that Mr. Nelson misused his position as a corporate fiduciary which constitutes grounds for subordination. Misuse of one's position as a corporate fiduciary may certainly be grounds for equitable subordination. *In re Joy Recovery Technology Corp.*, 286 B.R. 54, 83–84 (Bankr.N.D.Ill.2002). However, Nelson was not shown to be guilty of inequitable conduct pertaining to Debtor. He pursued his economic self-interests as an acknowledged creditor of Debtor but not in breach of his fiduciary duties of loyalty, care and good faith to the Debtor, its shareholders or its creditors.

The heart of Debtor's argument is that "Nelson is guilty of gross inequitable conduct as it pertains to the Debtor." RTI's Argument, p. 23. Mr. Nelson's alleged "gross inequitable conduct" while serving as a director of RTI consisted of the following:

a. Granting forbearance in payment until RTI was successful or for an unspecified time.

b. Purchasing the Bank Loan at par, while the same was current and not in default.

c. Planning to take over the company after it reached profitability.

(a) *Nelson's Forbearance as to Payment*

Nelson represented to Debtor and its Board of Directors and officers that his advances would not have to be repaid until the company became profitable. Nelson even made such a statement to Debtor's

banker, Michael Brosnahan. At various points between June 2004 and March 2006, Nelson informed the Debtor's Board of Directors as well as individual officers and directors of Debtor that Debtor did not then have to make payments as against his advances. But his remarks only made clear that he did not expect payments at that time. He never said "never." He never renounced his rights to payment at some future date. Indeed, he made clear that he deferred expectation of payment only until the company would become profitable.

Essentially, Debtor is urging that a creditor who forbears and then no longer forbears, even in the absence of harm to any entity other than the Debtor (which purported "harm" is the obligation to pay a legal debt) subjects the creditor to subordination. Moreover, the only action that RTI asserted that it took in "reliance" on Mr. Nelson's deferral of collection was to improve its business so as to become successful.

### (b) *Delay in Perfection*

Nelson failed to perfect his security interests until almost 28 months after the documentation supporting the $500,000 Line of Credit was executed. Debtor argues that his delay in perfection constitutes inequitable conduct, citing *In re Herby's Foods, Inc.,* 2 F.3d 128, 132 (5th Cir. 1993). In *Herby's Foods,* the delay in perfecting was mentioned in the opinion in the course of discussing many acts of conduct found to be inequitable. There was no explanation in the opinion as to how delay in perfection constituted inequitable conduct, but it may be supposed that it be inequitable if such delay affected third parties—a result not shown here.

### (c) *Acquisition of the Bank Loan*

In March 2006, even though Debtor was current on its payments to the Bank, Nelson, while still serving as a director of the Debtor, decided to acquire the Bank Loan. This had the effect of elevating his position as a junior secured creditor of the Debtor to that of a senior secured creditor. In late March 2006 or early April 2006, while still serving as a director of the Debtor, Nelson contacted the Bank to inquire about acquiring the Bank Loan. Unbeknownst to the Debtor and its Board of Directors, Nelson purchased the Bank Loan on or about April 4, 2006, while he was still a director of the Debtor, by paying off the entire Bank Loan debt with his own personal funds. The Subordination Agreement between the Debtor, Nelson, and the Bank prohibited Nelson from foreclosing on or forcing collection on his loans so long as the Bank Loan was outstanding, but he was entitled to collect interest on his loans so long as RTI was not in default on the Bank Loan. Moreover, the Bank was entitled to assign the loan to anyone without notice to RTI, a right contractually agreed to by RTI.

On April 10, 2006, while still serving as a director of the Debtor, Nelson obtained an assignment of the Bank's UCC–1 financing statements from the Bank. On April 12, 2006, he received the RTI Note to the Bank with the noted assignment thereof, and also the Security Agreement relating to the Bank Loan. As of the point Nelson purchased the Bank Loan, Debtor was current on that loan, and had the ability to continue to make payments when due. The effect of Nelson's acquisition of the Bank Loan was to increase Nelson's total claims against Debtor by the amount of the Bank Loan, and to elevate Nelson into the position as the only secured creditor of the Debtor. Debtor argues that this usurped a corporate opportunity.

The corporate law of the state of incorporation controls the fiduciary duties

of a corporation's officers and directors. *Treco, Inc. v. Land of Lincoln Sav., and Loan,* 749 F.2d 374, 377 (7th Cir.1984). The Debtor was incorporated in Delaware, so Delaware law applies.

Under applicable Delaware precedent, "[t]he doctrine of corporate opportunity represents but one species of the broad fiduciary duties assumed by a corporate director or officer." *Broz v. Cellular Information Systems, Inc.,* 673 A.2d 148, 154–55 (Del.1996). A fiduciary of a corporation, in appropriate circumstances, agrees to place the interests of the corporation before this fiduciary's interests.

▇▇▇ The classic statement of the doctrine of corporate opportunity can be found in *Guth v. Loft, Inc.,* 5 A.2d 503, 513 (1939):

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of the corporation, the law will not permit him to seize the opportunity for himself.

*Id.* at 510–11.

▇▇▇ Under Delaware law, the elements of misappropriation of corporate opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation. *McGowan v. Ferro,* 859 A.2d 1012, 1038 (Del.Ch.2004) (citing *Broz v. Cellular*

*Info. Sys., Inc.,* 673 A.2d 148, 154–55 (Del. 1996)).

▇▇▇ "A corporation has an interest or expectancy in an opportunity if there is some tie between that property and the nature of the corporate business." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 833 A.2d 961, 973 (Del.Ch.2003). "However, even where the opportunity at issue is not within the corporation's line of business and the corporation has no interest or expectancy in the opportunity, usurpation of a corporate opportunity may occur if a corporate officer or director has wrongfully embarked the corporation's resources therein." *Needham v. Cruver,* Nos. 12428, 12430, 1993 WL 179336, at *5 (Del.Ch. May 12, 1993).

▇▇▇ "In this analysis, no single factor is dispositive. Instead the Court must balance all factors as they apply to a particular case." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 833 A.2d 961, 972 (Del.Ch.2003). The determination of "[w]hether or not a director has appropriated for himself something that in fairness should belong to the corporation is 'a factual question to be decided by reasonable inference from objective facts.'" *Johnston v. Greene,* 121 A.2d 919, 923 (De.1956) (citation omitted).

Debtor's arguments are based on these facts:

> On April 11, 2006, Nelson resigned as a director of the Debtor by personally delivering a written resignation to Mr. Emerson at the Debtor's business premises. At the same time, Nelson personally delivered a written Notice of Default to Debtor wherein Nelson notified Debtor that he was asserting a secured claim against a in the amount of $1,710,000 and demanded, among other things, that Debtor pay $509,687 in interest that allegedly accrued on the orig-

inal $500,000 Line of Credit and later advances by Nelson by April 26, 2006, or face further action by Nelson. At the time Nelson delivered the Notice of Default, Nelson knew that Debtor did not have the ability to cure the stated default on his loans. From June 2004 through April 11, 2006, when Nelson delivered his resignation simultaneously with the Notice of Default, no payments were required by Nelson on account of his advances to Debtor. The filing of this Chapter 11 case was triggered by the Notice of Default and the Debtor's inability to pay the amount demanded by Nelson—a factual inability known to Nelson even before he prepared and delivered the Notice of Default.

At no point through April 11, 2006 did Nelson inform Debtor, its Board of Directors or its officers that Nelson had acquired the Bank Loan by paying off the Bank Loan with personal funds or that Nelson obtained an assignment of the Bank Loan and the liens on Debtor's assets emanating therefrom. Nor did Nelson inform the Debtor, its Board of Directors or its officers that he desired repayment of the funds he advanced to Debtor or that he intended to serve the Notice of Default.

Upon receipt of the Notice of Default, Debtor requested that Nelson extend the deadline for curing the default alleged by Nelson. Nelson's response to this request was that unless Debtor agreed to turn over its assets to a new entity formed and controlled by Nelson, Nelson would not agree to extend the deadline set by Nelson in the Notice of Default.

In conjunction with acquiring the Bank Loan and delivering the Notice of Default to the Debtor, Nelson consulted counsel about the possibility of forming a new corporation ("New Corp") into which Nelson was considering the possi-

bility of conveying Debtor's assets and business upon the Debtor's failure to cure the alleged default and the subsequent seizure of such assets and business by Nelson. Nelson consulted with his counsel with respect to the possible formation of a new corporation ("New Corp"). New Corp was to be owned and controlled by Nelson and Nelson's children. In that planning, none of the Debtor's other shareholders, officers and directors were to have any ownership or control of New Corp. Nelson's friend, James Treleaven, was selected by Nelson as the responsible officer of New Corp. Nelson was planning to fix Mr. Treleaven's salary from New Corp at $120,000 annually (the same salary being earned by Mr. Emerson). Nelson selected a name for New Corp that would include RTI. Nelson's planning in forming New Corp and seizing Debtor's assets and business in furtherance of the Notice of Default were done while Nelson was a director of Debtor. These plans were never disclosed to the Debtor, its Board of Directors or its officers.

The issue posed is whether the foregoing conduct by Nelson breached his fiduciary duties of loyalty, care and good faith owing to the Debtor and its shareholders.

It is argued that Nelson's conduct has conferred an unfair advantage upon him. Any conduct by which an insider gains an advantage over creditors constitutes inequitable conduct for purposes of equitable subordination under § 510(c) of the Bankruptcy Code. *In re Hoffman Associates, Inc.*, 194 B.R. 943, 965 (Bankr.D.S.C.1995). However, with respect to purchase of the Bank Note, Mr. Nelson (1) at no time acquired the legal right to accelerate the Bank Loan; (2) was at all times obligated to accept current payments on or prepayments of that loan; and (3) made no

demand nor took any action to accelerate or enforce this loan. In other words, Mr. Nelson's action could not, and did not, change RTI's obligations, rights or remedies in any way as pertains to the Bank.

The Debtor's key argument is that Mr. Nelson's acquisition of the Bank Loan eliminated restrictions on foreclosure in a Subordination Agreement between Mr. Nelson and the Bank and that the ability to retire or not retire the Bank Loan was its corporate opportunity. RTI's Argument, pp. 24–25. This argument has no weight.

RTI did not lose the "corporate opportunity" to retire the Bank Loan on its original terms or by pre-payment. In fact, it has not been proved that Mr. Nelson's purchase of the Bank Loan: (1) deprived RTI of any legal right or remedy; (2) was based on confidential or insider information; (3) harmed any creditor or RTI; (4) was effected at a discount with the possibility of profit; or (5) was performed with RTI assets. Nelson had the right to collect unpaid interest on his loan despite his Subordination Agreement with the Bank so his demand for interest on his loans made on April 11, 2006, could have been made without obtaining the Bank Loan. Moreover, RTI agreed in the Subordination Agreement that the Bank could assign the loan to anyone without notice. Therefore, Nelson, any other director or stockholder, or any stranger had the right to take assignment of the Bank loan at any time.

Finally, the Delaware standards for usurpation have not been met. Here the "opportunity" to take assignment of the Bank Loan was not some unique right of RTI; the freedom of the Bank to assign to anyone made that an economic opportunity open to anyone. The other officers and stockholders chose not to put up their cash to acquire the Loan. And despite the abili-

ty of RTI to retire the Bank Loan by paying it off, the company evidently chose not to eliminate the impediment in Nelson's Subordination Agreement to his forcing collection of personal loans. Moreover, acquisition of that loan was not part of RTI's "line of business," and RTI assets were not used by Nelson to buy the Bank Loan.

It is useful to recap the key facts:

Mr. Nelson, RTI, and the Bank entered into a Subordination Agreement dated September 1, 2002. *See,* Debtor's Ex. 15.

The Subordination Agreement allowed Mr. Nelson to collect unpaid interest owed to him for the Nelson Loan so long as Debtor was not in default under the terms of any outstanding loans with the Bank. Debtor's Ex. 15. Specifically, the Subordination Agreement provides that "until such time as the Bank shall have notified [RTI] and [Mr. Nelson] to the contrary or [RTI] shall have defaulted in the payment or performance of any of its obligations with respect to the Bank Loan, [RTI] shall be permitted to make regularly scheduled monthly interest payments to [Mr. Nelson] with respect to the Creditor Debt in the ordinary course of business." *See,* Debtor's Ex. 5, ¶ 1.

However, absent consent of the Bank, the Subordination Agreement barred Nelson from attempting to "impose or collect" any liabilities of RTI. *Id.* at ¶ 5. By taking assignment of the Bank Loan, Nelson was freed from this provision. On the other hand, under the Agreement which was affirmed by RTI, the Bank was entitled at any time to assign to anyone the debt due to it without notice, *Id.* at ¶ 8, and therefore, there was no prohibition on Nelson or anyone else taking assignment of the Bank Note. Other individual officers, directors, and stockholders could have done so.

RTI stayed current on its obligations with respect to the Bank Note from October 2004 through the filing of its Petition on April 25, 2006 (the "Petition Date"). Trial Tr., 31:4–13, Aug. 30, 2006.

Mr. Nelson purchased the Bank's interests in the Bank Note and the West Suburban Security Agreement for the face value of the outstanding principle due and owing under those obligations—$126,484.01. *Id.* at 30:16–25; Debtor's 7056–2 Response, ¶ 46. On or about April 10, 2006, the Bank assigned its interest in the Bank Note and the West Suburban Security Agreement to Mr. Nelson. Nelson Ex. 17, p. 3. Mr. Nelson did not receive any special benefit due to his status or affiliation with RTI during the process acquiring the Bank Loan. Debtor's 7056–2 Response, ¶ 47.

Therefore, Debtor's argument that it lost a corporate opportunity when Mr. Nelson purchased the WSB Loan has no merit. Mr. Nelson has not exploited his position with the company, received any special benefit at the expense of the creditors or otherwise received any unfair advantage as a result of his conduct.

In sum, the Debtor has adduced no evidence that Mr. Nelson did anything "evil" or "inequitable," much less that any harm to any creditor or even to the Debtor resulted. Most critical, he did not obtain a "corporate opportunity" under Delaware standards.

Thus, the Debtor has failed to meet its burden and there is no basis for equitable subordination of Nelson's claims.

## CALCULATION OF JUDGMENT

The calculation of debt due from RTI to Nelson as of the date the bankruptcy case was filed and presently now follows.

The advances in excess of $1,500,000 made by Mr. Nelson totaled $240,000 (the "Excess Advances")[3]

- RTI made two pre-bankruptcy interest payments to Mr. Nelson representing a 15% yield on a principal balance of: (i) $1,500,000; plus (ii) the Excess Advances, meaning that a certain portion of each such interest payment was attributable to principal the Court has found to have been a purchase of equity *ab initio*. Therefore, pre-bankruptcy interest due is recalculated based on a $1,500,000 principal balance.

- Having made these deductions from principal, as well as the agreed deduction on May 13, 2005 in the amount of $75,000 referenced in Nelson's Ex. 29, a schedule of revised principal balances was calculated for every month after Mr. Nelson's advances reached $1,500,000. Since RTI made no payment after June 2, 2004, the revised principal balance was $1,500,000 until May 13, 2005, $1,425,000 thereafter and did not change between then and the Bankruptcy Petition filing date.

- Interest pre-bankruptcy accrued at the 15% per year rate (*see,* Nelson Ex. 7) on these revised principal balances through the Petition Date to arrive at $1,846,625 as the amount of Mr. Nelson's claim for principal and accrued and unpaid as of the Petition filing date.

- To this amount is added the balance of $126,484 due West Suburban Bank

---

3. The evidence record was unclear whether Mr. Nelson advanced $1,740,000 or $1,785,000, cf. Nelson's Ex. 33 with the Debtor's Ex. 26. The larger number is that which RTI recorded. However, both counsel stipulated in open court that the correct figure for his total of advances was $1,740,000, Trial Tr., 10–12, Dec. 28, 2006, so the excess over $1,500,000 is found to be $240,000.

(the "WSB Loan") as of April 10, 2006, plus interest thereon at the Bank contract rate of 5.5% (*see* Nelson Ex. 17) from April 10,2006 to the Bankruptcy Petition Date. As of the Petition Date, the WSB Loan had an outstanding balance of $126,735. The result is a total of $1,973,360.20 of all debt due to Nelson as of the date that the related RTI Bankruptcy case was filed.

- From the $1,973,360.20 must be deducted the $180,000 paid to Nelson by RTI during pendency of the bankruptcy through December 26, 2006, reducing the balance to $1,793,360, and also reducing that amount by any further payments made by RTI to Nelson after December 26, 2006.

- Nelson is not entitled to any post-petition interest on the Pre–Petition Claim based upon this Court's findings on December 5, 2006, at the conclusion of a contested cash collateral hearing, that the value of the property securing Nelson's Pre–Petition Claim is less than such Pre–Petition Claim; the property securing the Pre–Petition Claim is not declining in value; and Nelson's secured interests in the Debtor's property are adequately protected. Therefore, under these circumstances, any post-petition payments to Nelson from the Debtor constituted principal reductions to the Pre–Petition Claim. *See also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

The effect of recharacterization as to the $240,000 contributed by Nelson in excess of $1,500,000 found to be due to Nelson as debt remains to be discussed. Since Nelson is a minority shareholder, the only appropriate way to recharacterize the $240,000 is to convert it to equity by granting him stock in return. Minority share-

holders do not ordinarily give gifts or make capital contributions to companies under financial stress, and the record here does not justify treating the $240,000 as a capital contribution.

While the evidence permits the requested relief recharacterizing the $240,000 from debt to equity, the evidence and posture of the case does not permit a calculation of the number of shares that Nelson should receive in return. The present case only declares the rights between Nelson and RTI, and it can therefore be declared here that some debt is recharacterized.

However, to calculate the resulting number of shares to Nelson would require a new proceeding that joins all other shareholders as necessary parties because other stock stands to be diluted, an action in which would he presented evidence by expert opinion as to value of the company so as to enable necessary calculations of the number of shares due to Nelson. The corporate value was not needed for purposes of this case (except generally to determine that it is less than the debt due to Nelson for purpose of interest calculation), and no expert as to such value either testified or was needed for purposes of this case. The need will be otherwise should one of the parties seek to bring the further action that is required to calculate additional stock due to Nelson.

### DISMISSAL

The nature of judgment to be entered following completion of the foregoing decision was announced in advance. Debtor's counsel then conceded that Debtor cannot reorganize in light of the resulting economics. He has since indicated that third parties have made approaches toward considering a purchase of the business. However, no purchase offer, plan or motion has yet been filed indicating a proposed sale, though some interest has been

shown. Absent sale, and in light of concession that Debtor cannot reorganize under Chapter 11 of the Bankruptcy Code, this case must be dismissed. Inability to effectuate a Plan in Chapter 11 is certainly a basis for dismissal. Other grounds were argued in favor of dismissal, but they were not established. Nelson has not shown:

a. continuing loss to or diminution of the estate during the bankruptcy;

b. any mismanagement of Debtor's assets and business; or

c. the filing of a bankruptcy case and petition in bad faith.

Present management has kept the Debtor's business stable and operations have shown progress and efficient operation. The filing of this bankruptcy was a rational reaction to Nelson's actions, and was partially successful. Therefore, the bankruptcy filing cannot be held to be in bad faith.

However, because Debtor cannot reorganize, the case will be dismissed on Nelson's Motion unless Debtor can demonstrate a potential viable sale.

### JUDGMENT AND ORDERS TO BE ENTERED BY SEPARATE ORDER

On Count 1, it will be adjudged and declared as follows:

Declaration will be made that the total debt presently due from RTI to Nelson on his personal debt and also on the Bank Loan assigned to him by West Suburban Bank is $1,793,320 less any payments by RTI to Nelson after December 26, 2006.

Declaration will be made that Nelson's advances in excess of $1,500,000 (amounting to $240,000) will be recharacterized as equity, and that he is entitled to stock in return for the advances over that amount. Since the said $240,000 must be transmitted into stock based on evidence of corporate value in an action joining all stock-holders, calculation of stock due to Nelson must be left for litigation on that issue in this or another court.

Further Declaration will be made that Nelson's investments up to $1,500,000 and interest thereon will not be recharacterized.

Judgment will be rendered in favor of Defendant Nelson on Counts II, III, and IV.

The Motions for Summary Judgment and Judgment at Close of Plaintiff's Proof will each be stricken as mooted by the foregoing Judgment, and the Motion to Dismiss will be granted unless a forthcoming sale be demonstrated.

The Findings and Conclusions set forth above determine the same issues posed in RTI's Objection to Nelson Claim No. 6. The Objection will be overruled and the Nelson claims allowed to the extent provided in the Judgment to be entered in this Adversary, a Judgment that will apply as well to the RTI Objection to Claim No. 6.